F I L E D
United States Court of Appeals
Tenth Circuit

FEB 4 1998

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

SEAN RICHARD SELLERS,

       Petitioner-Appellant,

v.

RONALD WARD, Warden of the
Oklahoma State Penitentiary,

       Respondent-Appellee.

No. 97-6062

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CIV-95-1945-R)

---

Steven M. Presson and Robert W. Jackson, Jackson & Presson, P.C., Norman, Oklahoma,
for Petitioner-Appellant.

William L. Humes, Assistant Attorney General (W.A. Drew Edmondson, Attorney
General, with him on the briefs), Oklahoma City, Oklahoma, for Respondent-Appellee.

---

Before **PORFILIO**, **BRORBY,** and **MURPHY**, Circuit Judges.

---

**PORFILIO**, Circuit Judge.

---

In 1986, at the age of sixteen, Appellant Sean Richard Sellers shot and killed three people. He was subsequently convicted and sentenced to death. He has exercised the full panoply of appeals and post-conviction remedies available to him in the state of Oklahoma. After a thorough and carefully considered sixty-nine page review of the issues presented it under 28 U.S.C. §§ 2241 and 2254, the United States District Court for the Western District of Oklahoma denied relief. Sellers has appealed that ruling presenting to us eight issues claiming denials of due process of law, effective assistance of counsel, and a fair trial, which individually and cumulatively resulted in a fundamentally unfair trial and unconstitutional sentence of death. Although troubled by the extent of uncontroverted clinical evidence proving Petitioner suffers from Multiple Personality Disorder, now and at the time of the offenses of conviction, and that the offenses were committed by an "alter" personality, we are constrained to hold Petitioner has failed to establish grounds for federal habeas corpus relief. Even though his illness is such that he may be able to prove his factual innocence of those crimes, we believe he must be left to the avenue of executive clemency to pursue that claim. We are not persuaded by any of the remaining arguments and, therefore, affirm the judgment of the district court.

# I.

Sellers' crimes were committed in two transactions.  His first victim was Robert Bower, a convenience store clerk, who died because Sellers told a friend he "want[ed] to see what it feels like to kill somebody."  Escaping detection for the first murder, six months later, Sellers killed his mother and stepfather, each with a single shot to the back of the head, making it appear the couple had been attacked by an intruder in the middle of the night.  Afterward, Sellers told a friend he thought he had done a good job feigning his innocent discovery of the bodies and described how he stood in his undershorts while firing the two shots so no blood would spatter and be discovered on his clothing.

At his state trial on three counts of first degree murder, defense counsel portrayed Sellers as the victim of Satanism and occult worship.  He further argued Sellers' addiction to the game, Dungeons and Dragons, dictated his actions and disconnected him from any consciousness of wrongdoing or responsibility.  A psychiatric expert testified Sean was "legally unconscious" at the time of all three killings and therefore incapable of forming the intent required of first degree murder.

For the murders of Vonda and Paul Bellofatto, the State alleged and the jury found the killings were especially heinous, atrocious, or cruel; that Sellers constituted a continuing threat to society; and Sellers knowingly created a great risk of death to more than one person when he committed the double homicide.  To support the death penalty

for the murder of Robert Bower, the State alleged and the jury found the heinous,

atrocious, or cruel and continuing threat aggravators.

In the direct appeal of the convictions, *Sellers v. State*, 809 P.2d 676 (Okla. Crim.

App. 1991) (*Sellers I*), the Oklahoma Court of Criminal Appeals struck the "heinous,

atrocious, or cruel" aggravator because the trial court failed to instruct the jury to limit the

application of this aggravator to murders involving torture or physical abuse of the victim

prior to death.  In its disposition of the issues, the appellate court held the "probability of

continuing threat" aggravator to be specific, was not vague as alleged, and was supported

by the evidence.[1]

In a subsequent  appeal from the denial of relief in a state post-conviction

proceeding, *Sellers v. State*, 889 P.2d 895 (Okla. Crim. App. 1995) (*Sellers II*), Sellers

---

[1]The Court of Criminal Appeals stated:

> Furthermore, the evidence presented at trial amply supported the jury's finding of this circumstance.  Prior to killing the convenience store clerk, appellant showed Howard [his friend] the gun he was carrying and told him, "I want to see what it feels like to kill somebody."  So he did.  In the following months, appellant bragged of his conduct to friends and co-workers.  Then, six months after the first homicide, he shot and killed his own parents.  He took precautions to make sure that his parents were dead and to make sure no one had heard the shots.  He committed the murders in his under shorts so that no blood could spatter on his clothes.  He intended to use Howard as an alibi and conceived an elaborate plan to "discover" his parents dead in bed.  The repeated incidences of violence and the calloused manner of appellant's actions in this case support finding this aggravating circumstance in all three homicides.

*Sellers v. State*, 809 P.2d 676, 690 (Okla. Crim. App. 1991) (*Sellers I*).

- 4 -

asserted he had recently discovered evidence that at the time of the crimes he suffered from a childhood brain injury and a mental condition known as Multiple Personality Disorder (MPD). He also contended he received ineffective assistance of counsel. The Oklahoma Court of Criminal Appeals rejected both contentions.

The court held, "although evidence of then existing but not yet presented or heard physical brain damage and MPD presents a valid ground for post-conviction relief under 22 O.S. 1991, § 1080(d), it has been waived under 22 O.S. 1991, § 1086." *Sellers II*, 889 P.2d at 897. It similarly concluded by failing to raise it on appeal Sellers waived his argument that statutorily imposed monetary limits on funding defense expert witnesses precluded his properly exploring his insanity defense. The court held under § 1086 Sellers also waived his ineffective assistance of trial counsel claim and rejected "on the merits" his claim appellate counsel was ineffective.

In light of these holdings, the federal district court concluded each claim presented here satisfies exhaustion principles. Nonetheless, guided by then recently enacted provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the district court issued a certificate of appealability only on the issue pertaining to the continuing threat aggravator and denied a certificate on the remaining issues.

Subsequent to that ruling, the Supreme Court held in *Lindh v. Murphy*, ___ U.S. ___, 117 S. Ct. 2059, 2068 (1997), that § 2253(c) of the AEDPA (pertaining to the certificate of appealability) applies only to cases filed after April 24, 1996. Because the

petition in this case was filed before that date, the certificate of appealability is not a jurisdictional requirement here. *See United States v. Kunzman*, 125 F.3d 1363, 1364 n.2 (10th Cir. 1997). We have heretofore granted a certificate of probable cause and consider all the issues raised by Petitioner.

## II.

## A.

Petitioner asserts at the time of the murders he was suffering from Multiple Personality Disorder. He contends the State's misapplication of its own procedure has denied him post-conviction due process because he has been barred from the opportunity to fully litigate this issue. Sellers urges the evidence of his brain injury and MPD is material; could not have been discovered before trial; is not cumulative; and creates a reasonable probability of changing the outcome of the trial. Yet, the Oklahoma Court of Criminal Appeals erroneously ruled the claim had been waived under Okla. Stat. tit. 22, § 1086 (1991).[2] He argues the federal district court's review was clouded by that

---

[2]That section entitled "Subsequent Application" is part of the Post-Conviction Procedure Act and states, in part:

> All grounds for relief ... must be raised in his original, supplemental or amended application. Any ground finally adjudicated or not so raised, or knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the applicant has taken to secure relief may **not be the basis for a *subsequent* application** unless the court finds a ground for relief asserted which for sufficient reason was not asserted or was inadequately raised in the prior
>
> (continued...)

- 6 -

misapprehension.

Sellers asserts both state and federal courts overlooked that he had raised the issue in his <u>original</u> application for post-conviction relief, not a subsequent application. Thus, while ***Hopkinson v. Shillinger***, 866 F.2d 1185 (10th Cir. 1989), holds that errors in post-conviction procedures are not cognizable federal habeas corpus claims, he asserts the proposition does not exactly address his case. He argues he is the victim of a judicially created "Catch-22" where state law restricts newly discovered evidence claims to a post-conviction proceeding, but he has been denied access to that remedy because he failed to assert the issue of his mental affliction on direct appeal. Consequently, he complains, the State has no mechanism to address his claim.

The federal district court relied on ***Herrera v. Collins***, 506 U.S. 390 (1993), and ***Hopkinson*** to reject this contention, reciting the claim does not rise to a constitutional level because it is collateral to the basis for his incarceration. Nevertheless, in an abundance of caution, the court proceeded to address whether Sellers had persuasively demonstrated such a powerful case of actual innocence that it would render his execution unconstitutional. Ultimately it concluded Sellers had failed to meet this extraordinarily high threshold.

---

[2](...continued)
application.

(emphasis added).

- 7 -

The court examined affidavits previously submitted with Sellers' state post-conviction petition attesting to his physical and mental state as well as the subject of MPD. Based on that review, the court stated:

> There is significant neurological and psychological evidence that Petitioner suffers from MPD and some brain damage and a psychologist and psychiatrist who evaluated Petitioner in October of 1992 have opined that <u>since</u> or <u>because</u> Petitioner suffers from MPD, an alter personality likely or must have been in control at the time the murders were committed, if Petitioner committed them, and that the alter personality did not understand nor care about the nature of his acts nor whether they were right or wrong, or that it was likely that the alter did not know the difference between good and bad or right and wrong. But this evidence does not amount to a truly persuasive demonstration of actual innocence nor meet the extraordinarily high threshold of showing that a constitutional violation will occur if Petitioner is executed for a number of reasons.

(emphasis in original) (footnote omitted).

The court explained it rejected the newly discovered evidence because the expert opinions were based on examinations conducted more than six years after the crimes, and thus the reliability of the conclusions of which personality was in control was "diminished." Moreover, the court pointed out the experts "offered no basis for their opinions that an alter personality must have been in control at the time of the murders." Additionally, the court stated there was no evidence Sellers' host personality was aware of or could not control the alter. Finally, the court noted:

> [T]here is overwhelming evidence in the trial record that Petitioner committed the murders and that the personality in control of Petitioner immediately before, during and after the murders was the same, was cognizant of what he was doing and understood and appreciated the difference between right and wrong and the wrongful nature of this

conduct.

The court continued, even if Sellers established he could not have discovered the MPD earlier but for the constitutional violation which prevented the discovery, he failed to show his actual innocence or that any reasonable juror would not have found even one aggravating circumstance in any of the murders.

**B**.

On appeal, Sellers maintains he presented to the district court overwhelming, undisputed evidence that at the time of his trial and direct appeal the clinical tests for discovering and confirming the presence of MPD had not been developed. Further, he provided evidence to establish that it usually takes several years and several incorrect diagnoses to determine a person suffers from MPD. The State submitted no opposing evidence.

We begin our analysis by noting the record is in a remarkable state. It firmly appears from the district court's observation Petitioner's claims are not fanciful; indeed, they are supported by significant evidence the person facing death for three murders is not the person who committed the crime. Summarized, the uncontroverted expert affidavit testimony is: (1) A quantitative electroencephalogram test (QEEG) disclosed Sellers has brain damage as a result of a closed head injury suffered as a child; (2) The QEEG dramatically changed with each of Sellers' alter states, indicating the presence of at least three alter personalities; (3) An Evoked Potential Test (EPT), which relies upon

biological signals from the body and cannot be falsified by the patient, showed multiple objective changes in brain function and reliably confirmed the QEEG; (4) A second series of tests and extensive interviews were conducted by a different physician who actually spoke to two of Sellers' alter personalities; (5) Seller's suffered from MPD at the time of the killings; (6) One of Sellers' alter personalities "must have been in executive control of [Sellers'] person or body" at those times; (7) There was only a limited awareness of MPD in the mental health community in 1987 when Sellers was tried; and (8) MPD is a "hidden disease" which generally takes seven years to confirm. In light of this evidence, the conundrum with which we are presented, however, is whether this claim of MPD based innocence can survive the threshold requirements of federal habeas corpus to render it justiciable.

This is a unique and profound case because it presents intertwined issues of habeas jurisprudence. Unwinding the knot into which the matter is tied provides us with the key to its resolution. Before setting ourselves to that task, however, we are constrained to observe the question of actual innocence predicated upon the actions of multiple personalities has a twist that affords no parallel that we have found.

Given the unusual context of this case, we believe other courts have begged the issue by ruling the proof of Sellers' guilt is "overwhelming." Indeed, if believed by a jury, Petitioner's evidence of the culpability of an alter personality renders the person known as Sean Sellers actually innocent. Yet, we cannot reach that point because of the

- 10 -

limited nature of federal habeas corpus and the precedent by which we are guided.

We must begin, as did the district court, with consideration of how claims of actual

innocence fall within the scope of federal habeas corpus. It is settled that:

> Claims of actual innocence based on newly discovered evidence have never
> been held to state a ground for federal habeas relief absent an independent
> constitutional violation **occurring in the underlying state criminal
> proceeding.**
>     ....
>
> This rule is grounded in the principle that federal habeas courts sit to
> ensure that individuals are not imprisoned in violation of the Constitution--
> not to correct errors of fact.

*Herrera*, 506 U.S. at 399-400 (citations omitted) (emphasis added). "Few rulings would

be more disruptive of our federal system than to provide for federal habeas review of

freestanding claims of actual innocence." *Id.* at 401. As the Court noted, however,

> This is not to say that our habeas jurisprudence casts a blind eye
> toward innocence. In a series of cases culminating with *Sawyer v. Whitley*,
> ... we have held that a petitioner otherwise subject to defenses of abusive or
> successive use of the writ may have his federal constitutional claim
> considered on the merits if he makes a proper showing of actual innocence.
> This rule, or fundamental miscarriage of justice exception, is grounded in
> the "equitable discretion" of habeas courts to see that federal constitutional
> errors do not result in the incarceration of innocent persons.... But this body
> of our habeas jurisprudence makes clear that a claim of "actual innocence"
> is not itself a constitutional claim, but instead a gateway through which a
> habeas petitioner must pass to have his otherwise barred constitutional
> claim considered on the merits.

*Id.* at 404. To pass through this gateway, petitioner must present

> evidence of innocence so strong that a court cannot have confidence in the
> **outcome of the trial** unless the court is also satisfied that the trial was free
> of nonharmless constitutional error, the petitioner should be allowed to pass

through the gateway and argue the merits of his **underlying claims**.

....

[Moreover] the evidence must establish sufficient doubt about his guilt to justify the conclusion that his execution would be a miscarriage of justice *unless* his conviction was the product of a fair trial.

*Schlup v. Delo,* 513 U.S. 298, 316 (1995) (emphasis added) (italics in original).

Substantial claims that errors of constitutional dimension have caused the conviction of an innocent person are "extremely rare." *Id.* at 324. To succeed upon a miscarriage of justice plea, a petitioner must show constitutional error "'probably' resulted in the conviction of one who was actually innocent." *Id.* at 326, referring to *Murray v. Carrier*, 477 U.S. 478, 496 (1986). When the contention of actual innocence is predicated upon newly discovered evidence, the petitioner's burden of proof is to demonstrate "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup,* 513 U.S. at 327. Actual innocence does not mean merely that the new evidence creates a reasonable doubt of the petitioner's guilt but that "no reasonable juror would have found the defendant guilty had that evidence been produced at trial." *Id.*

Thus, the rule by which this case must be governed has several dimensions. First, the claim of innocence grounded in MPD itself is not a basis for federal habeas corpus no matter how convincing the evidence.[3] Second, the claim of innocence is merely the

---

[3]Interestingly, the claim is grounds for post-conviction relief under Oklahoma law. *See Sellers v. State*, 889 P.2d 895, 897 (Okla. Crim. App. 1995) (*Sellers II*).

means by which an otherwise barred constitutional error affecting the fairness of the petitioner's trial can be heard. Third, to allow a habeas court to reach that constitutional error, the claim of innocence must be of the magnitude that we can say no reasonable juror would have convicted Sean Sellers had it been presented at trial. These are very high barriers to Petitioner's success.

The first hurdle Petitioner must overcome is that his principal constitutional argument does not revolve about trial error but about matters that occurred subsequently. He maintains the *Sellers II* court mistakenly barred him from airing his evidence of MPD because of its erroneous interpretation of an Oklahoma statute relating to post-conviction review. *See* Okla. Stat. tit. 22, § 1086. Assuming the contention is correct and the Oklahoma court mistakenly construed the statute, the error is one of state law not cognizable in habeas corpus because "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Matthews v. Price*, 83 F.3d 328, 331 (10th Cir. 1996)*; Steele v. Young,* 11 F.3d 1518, 1524 (10th Cir. 1993). Although Petitioner indeed finds himself in a judicially created "Catch 22," the dilemma is not one we can reach through the limited access provided by our jurisdiction.

Petitioner is further hampered by the fact no constitutional provision requires a state to grant post-conviction review. *Pennsylvania v. Finley,* 481 U.S. 551, 557 (1987). Moreover, because the constitutional error he raises focuses only on the State's post-conviction remedy and not the judgment which provides the basis for his incarceration, it

states no cognizable federal habeas claim. *Montgomery v. Meloy,* 90 F.3d 1200 (7th Cir. 1996); *Steele*, 11 F.3d at 1524; *Hopkinson*, 866 F.2d at 1218-19. Thus, although Petitioner has presented substantial credible evidence that now and at the time of his trial he suffers from a mental illness that may have bearing upon his factual innocence of the crimes for which he stands convicted, he does not cross the threshold barrier to federal habeas corpus. Even if the constitutional basis of his claim had affected the jury's verdict thereby permitting him to escape the barrier presented by a collateral attack, we could not say he has satisfied the high burden of showing no reasonable juror would convict him on the basis of the evidence he has presented.

C.

The nature of his newly discovered evidence, in the form of affidavits, already has been called into question. "In the new trial context, motions based solely upon affidavits are disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations." *Herrera*, 506 U.S. at 417. Although the evidence presented in the affidavits of the psychiatric experts is clear, strong, and supportive, it has not been tested in the crucible of cross-examination. Nonetheless, the medical theory espoused is unique and, as the experts have established, virtually unknown at the time of Sellers' trial. It may justly be presumed that lay people would be skeptical of the theory. Thus, without benefit of a full exploration of the opinions of the experts by cross-examination, it is exceedingly difficult to believe not one

- 14 -

juror would disregard the opinions expressed and vote to convict.

We are not unmoved by the Petitioner's dilemma. Nor are we unconvinced that given an opportunity by a state court he could not cast doubt on the propriety of the sentence he faces. Yet, granting him relief on these grounds is beyond the present scope of federal habeas corpus. He is not completely without recourse, however, because he apparently still has access to Executive Clemency. *See* Okla. Const. art. VI, § 10; Okla. Stat. tit. 21, § 701.11a (Supp. 1990). Nevertheless, we hold the district court did not err in its disposition of this issue.

### III.

Petitioner next contends Oklahoma's "continuing threat" aggravating circumstance is unconstitutionally vague and overbroad and therefore unconstitutionally applied. Subsequent to the filing of briefs in this case, we held to the contrary in ***Nguyen v. Reynolds,*** ___ F.3d ___, No. 96-5254, 1997 WL 693685 (10th Cir. Okla.). That resolution binds us here. ***United States v. Foster***, 104 F.3d 1228, 1229 (10th Cir. 1997).

### IV.

At the penalty stage of the trial, the defense sought to present the testimony of a law professor who, according to the offer of proof, would testify that juveniles were developmentally different from adults. The state judge refused to allow the testimony. Petitioner now contends the refusal amounted to a denial of his right to present mitigating

evidence contrary to the provisions of Okla. Stat. tit. 21, § 701.10 (1981),[4] and ***Eddings v.***

***Oklahoma***, 455 U.S. 104, 115 (1982).  Reminding that ***Eddings*** holds that "youth is more

than a chronological fact," ***id.*** at 116, Petitioner maintains the error takes on constitutional

proportions.  He contends the State took every opportunity to capitalize on the absence of

evidence pertaining to youth.  Indeed, the district attorney argued to the jury:

> He's only 17, but when he picked up that .357 he became a man.  And he
> walked out and he blew Robert Paul Bower away.  And when he picked up
> that .44 Special, he became a man again.  And he walked in and he blew
> Lee and Vonda Bellofatto into another world.  He's acted like a man, he's
> going to have to stand up here like a man.

Thus, Petitioner maintains, the State was permitted to argue about his adulthood, but the

defense was not permitted to counter that argument with expert testimony.  He asserts this

prohibition eviscerates the use of age as a mitigating factor by removing any meaning

from the concept.  He adds that the error was compounded when the jury was instructed it

was to determine the mitigating effect of his age.  Therefore, Petitioner concludes the

---

[4]That section states:

> Upon conviction ... of guilt of a defendant of murder in the first
> degree, the court shall conduct a separate sentencing proceeding to
> determine whether the defendant should be sentenced to death, life
> imprisonment without parole or life imprisonment.
> ....
> In the sentencing proceeding, evidence may be presented as to *any*
> mitigating circumstances or as to any of the aggravating circumstances
> enumerated in Section 701.7 et seq. of this title.

(italics added).

state court denied him due process in excluding all of the testimony with the observation most people know the difference between youths and adults.

Relying in part upon *Lockett v. Ohio,* 438 U.S. 586, 604 (1978) ( plurality), and *Eddings*, 455 U.S. at 104, the district court observed a sentencer must not be precluded from considering the defendant's character or the circumstances of the offense that the defendant proffers in mitigation. Citing *Blystone v. Pennsylvania*, 494 U.S. 299, 304-05 (1990), the court noted the type of evidence required by the Constitution to be presented to the sentencer is that pertaining to a defendant's character, record or background, and the circumstances of the offense. With those principles as guidelines, the court reviewed Petitioner's offer of proof at trial and discovered defense counsel, in his own words, intended the testimony show Oklahoma's history of not executing juveniles, that most of the "civilized nations" with the exception of the United States and "a few other nations" do not allow the execution of a person under the age of eighteen; and, that although there are international treaties banning the execution of minors, the United States has not ratified them. The professor also would have stated a civilized society would prohibit the execution of a person who was under the age of eighteen at the time the crime was committed. The notion that juveniles are developmentally different was integrated into many arguments and was, according to trial counsel, " a factor that should be considered in totally abolishing the death penalty for juveniles."

From this record, the district court gleaned the proffered testimony is "best

characterized as a policy argument as to why the death penalty for juveniles should be abolished -- an argument appropriately directed to the Oklahoma Legislature." More importantly, the court noted, the proffered testimony was not "relevant mitigating evidence of the character and record or background of the defendant and the circumstances of the offense." The court observed the developmental difference between adults and juveniles "is a fact within the knowledge which jurors possess in common with other persons." Therefore, the court reasoned when this knowledge is coupled with the state court's instruction that the jury could employ its general knowledge in arriving at the sentence, the mitigating effect of the developmental differences was placed before the jury, citing *Graham v. Collins*, 506 U.S. 461, 475 (1993). We agree with that analysis and cannot add to it in any intelligent manner. We see no error in this ruling.

**V.**

Petitioner next maintains the state trial court unconstitutionally limited his voir dire of the jury on the subject of the death penalty. The court sustained the State's objection to defense counsel's asking prospective jurors whether the juror would consider the youth of the defendant as a mitigating factor, making it impossible, he contends, to carefully exercise his peremptory challenges. In contrast, he complains the trial court permitted the prosecutor to ask jurors whether they would be offended to have "[me] as district attorney seeking the death penalty for a 17-year old...." Further, when the prosecutor told the jury it could find there were no mitigating factors, it underscored the State's argument that

- 18 -

youth is not a proper mitigating consideration. Petitioner urges the court's refusal to permit his line of inquiry is contrary to **Eddings**. He argues if the Constitution allows voir dire on racial attitudes in a case involving an interracial incident, **Turner v. Murray**, 476 U.S. 28, 37 (1986), surely asking a juror whether he has any bias or attitude toward youth would be appropriate. Attitudes toward youth, he urges, could be as fixed as attitudes toward always or never imposing the death penalty. Petitioner argues: "a person on trial for his life has a constitutional right to know whether a prospective juror will follow the law." As youth is a mitigating factor, it was "especially important for Sean Sellers to know which potential jurors would be skeptical of using youth as a mitigator." Petitioner states the prosecutor knew what defense counsel was seeking and improperly blocked this line of questions. By prohibiting counsel from asking these questions, the state trial court violated Petitioner's Sixth Amendment right to the effective assistance of counsel.

In rejecting this contention, the federal district court found the voir dire "constitutionally adequate" because jurors were asked individually and collectively whether they would consider life imprisonment or whether they would automatically impose a death sentence if Sellers were found guilty. The court observed **Wainwright v. Witt**, 469 U.S. 412, 424 (1985), sets forth the standard for excluding jurors *for cause*: "That standard is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."

- 19 -

The fundamental purpose of the inquiry is whether the juror will follow the law. *Mackall v. Murray*, 109 F.3d 957, 963 (4th Cir. 1997). In *United States v. McCullah*, 76 F.3d 1087, 1114 (10th Cir. 1996), we also held a trial court is not "required ... to allow inquiry into each juror's views as to specific mitigating factors as long as the voir dire was adequate to detect those in the venire who would *automatically* vote for the death penalty."

In this case, defense counsel attempted to inquire into whether prospective jurors would find specific facts mitigating. This effort is not equatable to whether a juror would refuse to consider mitigation of any kind. As noted by the district court, a juror of that mind-set would be excusable for cause, but what Petitioner was attempting to do was to ferret out information that would aid in the exercise of his peremptory challenges. So long as the voir dire is adequate to detect jurors who could not be impartial, a trial court is not <u>required</u> by the Constitution to grant such a searching inquiry. *Id.* at 1114. Indeed, the breadth of questions eliciting jurors' opinions about the death penalty itself must lie within the discretion of the trial judge. In this instance, we agree with the district court the voir dire was adequate to serve the constitutional mandate of providing an impartial jury.

## VI.

Petitioner contends the Confrontation Clause was violated when the trial judge closed an area of inquiry to defense counsel during cross-examination of the State's

psychological expert witness, Dr. Herman Jones. Defense counsel attempted to question whether Dr. Jones would change his opinion of Sellers' state of mind after consideration of certain of Sellers' specific past writings. The district court sustained the State's objection because the court had already held the documents contained inadmissible hearsay; therefore, the testimony would also be inadmissible. Counsel made an offer of proof that the writings, which Dr. Jones had not examined, would bear directly on the basis of the expert's opinion.

The federal district court rejected this claim, concluding Petitioner's rights to due process and to compel favorable testimony were not violated. Habeas relief is not available on this ground unless the Petitioner can show his whole trial was rendered fundamentally unfair by the limitation of the cross-examination. *See **Donnelly v. DeCristoforo,*** 416 U.S. 637, 642 (1974). As the district court observed, review of this issue in the context of federal habeas corpus is an inquiry which turns on the materiality of the excluded evidence to the presentation of the defense. ***Matthews v. Price***, 83 F.3d 331, 332 (10th Cir. 1996). The question devolves to whether the ruling deprived Sellers of "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." ***Delaware v. Fensterer***, 474 U.S. 15, 20 (1985) (italics in original).

As did the district court, we have reviewed the record of the direct and cross-examination of Dr. Jones, and we see nothing in the limitation of examination which

meets the required tests. Because the opinion expressed by Dr. Jones was diametrically opposed to that of Petitioner's expert, Dr. Krimsky, the purpose for the cross-examination was to call into question the basis upon which Dr. Jones arrived at his diagnosis. Although Dr. Jones stated having access to Sellers' writings would aid in his analysis, we are unsure whether the writings would affect his opinion. Moreover, defense counsel conducted a thorough examination of Dr. Jones' evaluation of Sellers' condition and the various points on which Dr. Jones and Dr. Krimsky differed. Even assuming, for the sake of review, the materiality of the writings, we simply cannot say the record discloses the denial of an effective cross-examination of the State's expert. Nor do we believe the restriction on cross-examination had a substantial or direct influence on the verdicts.

**VII.**

Because Oklahoma law permits introduction of *any* mitigating evidence, Petitioner urges it was error for the trial court to prevent his witness, Ms. Betsey Payne, the executive secretary of the Oklahoma Pardon and Parole Board, from testifying that a person sentenced to life imprisonment could not be considered for parole for at least fifteen calendar years and is not eligible to receive good time or other credits. Left with the decision then to sentence him to death or to life, believing that meant he would be out in a short time, the jury was deprived of vital mitigating evidence to inform its choice. Petitioner relies on *Simmons v. South Carolina*, 512 U.S. 154 (1994), which held in some circumstances states may decide whether to inform the jury about the parole

- 22 -

eligibility status of a life sentence.

Once again, our consideration of this issue is foreclosed by *Nguyen v. Reynolds*, ___ F.3d ___, No. 96-5254, 1997 WL 693685. There, following the *Teague* doctrine, we held *Simmons* inapplicable to death sentences imposed prior to its issuance. Inasmuch as the penalty in this case was decreed prior to *Simmons*, we must abide by that holding.

**VIII.**

Petitioner contends the state district attorney made comments during closing argument which he believes violated his due process rights and unfairly minimized the jury's sense of responsibility for the imposition of the death penalty. Petitioner states the district attorney "kept referring to himself in the third person, and was sending a strong signal to the jury that it was the district attorney who approved of the death penalty, and that many hurdles had to be jumped before a capital murder trial could ever occur." Petitioner also observes, "he even suggested to the jury that had there been only one incident, he would not have sought the death penalty." Indeed, the prosecutor told the jury, had it not been for the multiple crimes, "You probably wouldn't be here right now."

The district court found "in the context of the entire final argument" the statements were "not reasonably susceptible to an interpretation that the district attorney or some other authority, not the jury, was the final or true arbiter of [Sellers'] punishment." Thus, the court concluded, unlike those in *Caldwell v. Mississippi*, 472 U.S. 320, 340-41 (1985), the prosecutor's statements in this case did not render the death penalty verdicts

unreliable. We agree.

Viewing the record with charity, we note the prosecutor's hyperbole may be regarded as colorful. It is not, however, the stuff from which anyone could perceive an offer to share the burden of the ultimate decisions in this case. Thus, we agree with the district court that the district attorney did not run afoul of *Caldwell.* We conclude there is no merit in Petitioner's argument. *See* *Hopkinson,* 888 F. 2d at 1295 n.5.

## IX.

Finally, Petitioner contends he was denied his right to the effective assistance of counsel. In a double faceted attack, Petitioner argues he was denied effective assistance of trial counsel because his attorney did not discover the evidence of his brain injury and MPD. Alternatively, Petitioner argues his attorney "woefully underemphasized the best evidence for an insanity verdict" by choosing to focus on his Satanism and cultism rather than his inability to distinguish right from wrong. He concludes by asserting he was prejudiced by the state statute which limited him to $750 with which to obtain psychiatric assistance.[5]

In light of Petitioner's own evidence that MPD could not have been discovered at the time of his trial, his Sixth Amendment argument based on trial counsel's failure to

---

[5]Although Petitioner also advances a somewhat unclear argument that the Oklahoma Court of Criminal Appeals incorrectly ruled on his ineffective counsel claim, we see that contention presented to us in the posture of an invitation to review the propriety of the state court's holding. We decline the invitation as beyond the scope of 28 U.S.C. § 2254.

discover the defense sounds with a hollow ring, notwithstanding the spin put on it by the Oklahoma court. Having provided us with an uncontroverted record that the illness could not have been discovered at the time of trial, we will not accept Petitioner's postulate here.

The district court undertook a thorough examination of the record in light of the contention trial counsel failed to properly assert a "traditional" insanity defense and concluded counsel's strategy was not unsound, relying upon **Strickland v. Washington**, 466 U.S. 668, 689 (1984). The court observed the state of expert evidence at the time of trial undercut the value of the insanity defense because at best the evidence showed Sellers was not "mentally ... aware, not appreciating, not registering what was happening" at the time of the killings of his mother and stepfather. Moreover, the district court found the jury ultimately considered a "traditional temporary insanity defense" and concluded the evidence of Sellers' involvement with Dungeons and Dragons and Satanism "buttressed rather than detracted from the insanity defense" despite the alleged novelty of that approach. Thus, the court held Petitioner was not prejudiced by his trial counsel's failure to focus on the traditional defense. The court concluded its confidence in the outcome of the trial was not undermined.

Claims of ineffective counsel are mixed questions of law and fact which we review de novo. *See **Williamson v. Ward**,* 110 F.3d 1508, 1513 (10th Cir. 1997). To prevail on his claim of ineffective trial counsel, Petitioner must show the performance of counsel

was deficient in so serious a manner that counsel was not providing the level of representation required by the Sixth Amendment and the deficient performance was so prejudicial that he was deprived of a fair trial with a reliable result. *Strickland,* 466 U.S. at 687. Courts may address the performance and prejudice components in any order but need not address both if a petitioner fails to make a sufficient showing of one. *Id.* at 697. Focusing upon the contention here that trial counsel's performance was deficient, we are guided by the principle that to be constitutionally deficient counsel's performance must have been completely unreasonable, not merely wrong. *Hoxsie v. Kerby* 108 F.3d 1239, 1246 (10th Cir. 1997).

With these thoughts in mind, we agree with the conclusion reached by the district court. Although the benefits of hindsight make it easy to suggest how better issues could have been raised, we believe it is clear trial counsel functioned appropriately within the ambit of available evidence and his performance was not unreasonable. We hold, therefore, Petitioner has failed to satisfy his burden of persuasion. Moreover, having rested his claim of ineffective appellate counsel on failure to assert trial counsel was incompetent for not raising the MPD defense, we believe our conclusions here summarily dispatch Petitioner's argument on that score.

Finally, Petitioner argues here, as he did in the district court, the limitation on available funds for psychiatric assistance deprived him of the opportunity to have further significant tests performed which the evidence of his brain damage should have indicated.

The district court carefully analyzed this issue and found, first, there was no evidence in the record reflecting the defense expert did not consider the possibility of Petitioner's organic brain disorder or further specific testing was required but not performed because of inadequate funding. Moreover, Petitioner admitted routine psychological examinations given to criminal defendants did not include such tests. The court carefully observed, however, even assuming the expert was inadequate in his clinical observations and failed to require necessary testing, there is nothing in the record suggesting trial counsel was aware of the deficiency. When coupled with the Petitioner's lack of "outward manifestations" of organic brain damage or other evidence of psychological disorder, the routine exclusion of certain testing and the presumption of reasonable professionalism to be accorded counsel, the district court failed to find a Sixth Amendment violation based on the suggested lack of funding. Unable to add to the careful analysis of the district court, we simply concur in its reasoning and conclusions. Concluding counsel was not deficient, we need not examine whether Petitioner was prejudiced by his acts.

## X.

Petitioner states our refusal to grant his motion to file a brief in excess of seventy-five pages deprived him of the opportunity to brief other issues. Believing the number of issues he was able to address is as much a function of counsel's loquaciousness as it is our limitation on the number of pages available for discourse, we have nonetheless examined the record of the additional matters presented to the district court and the

decisions made on those issues. Suffice to say that examination leads us to conclude the district court did not err in any respect. The judgment of the district court is

**AFFIRMED**.