**PUBLISH**

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 28 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DEWEY GEORGE MOORE,

     Petitioner-Appellant and
Cross-Appellee,

v.

GARY E. GIBSON, Warden,
Oklahoma State Penitentiary,

     Respondent-Appellee and
Cross-Appellant.

No. 98-6004 & 98-6010

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. CIV-95-2018-A)**

Steven M. Presson (Robert Wade Jackson, with him on the briefs), Jackson &
Presson, P.C., Norman, Oklahoma, for Petitioner-Appellant and Cross-Appellee.

Sandra D. Howard (W.A. Drew Edmondson, Oklahoma Attorney General with her
on the brief), Assistant Attorney General, Chief, Criminal Appeals, Oklahoma
City, Oklahoma, for Respondent-Appellee and Cross-Appellant.

Before **BRORBY**, **KELLY**, and **MURPHY**, Circuit Judges.

**MURPHY**, Circuit Judge.

Petitioner Dewey George Moore appeals the district court's denial of federal habeas relief from his Oklahoma first degree murder conviction and death sentence. *See* 28 U.S.C. § 2254. Petitioner was convicted of first degree murder and kidnaping for the abduction and murder of twelve-year-old Jenipher Gilbert. Respondent cross appeals, challenging the district court's determination that the Antiterrorism and Effective Death Penalty Act of 1996 does not apply to petitioner's habeas petition.

As grounds for habeas relief, petitioner asserts: 1) he is entitled to discovery and an evidentiary hearing on his allegations that police planted evidence against him; 2) the State's chief witness, a forensic chemist, falsely testified at trial, depriving petitioner of due process and a fair trial; 3) the trial court erred in dismissing a prospective juror for cause; 4) the prosecutor's misconduct deprived petitioner of a fair trial; 5) the application of Oklahoma's "especially heinous, atrocious or cruel" aggravating circumstance was unconstitutional; 6) there was insufficient evidence to support the jury's finding that the murder was "especially heinous, atrocious or cruel;" 7) Oklahoma's continuing threat aggravating circumstance is unconstitutionally overbroad; 8) petitioner's trial and direct appeal attorneys were constitutionally ineffective; and 9) the cumulative effect of these errors deprived petitioner of a fair trial. The district court granted petitioner a certificate of appealability as to all of these

issues. *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b)(1). We affirm the district court's denial of habeas relief, with the exception of its treatment of petitioner's claim that police planted evidence against him, which we remand to the district court for discovery.

I.  FACTS

The victim was abducted on September 27, 1984, at approximately 9:30 P.M., following a junior high school football game. Two adults and a fifteen-year-old student witnessed the abduction. All three indicated that the victim had been forced into a yellow car. At trial, both adults identified petitioner's yellow car as looking like the car in which the victim was abducted.

The day after the abduction, the student witness, Paulo Gomes, identified two men from a photo array, one of whom was petitioner, as similar to the man he had seen abduct the victim. At trial, the student again identified petitioner as looking like the man who forced the victim into the yellow car.

The victim's partially clad body was found at 11:00 A.M. the morning after the abduction in a field ten miles from the school. She had been strangled and suffocated and had died several hours before her body was found. The pep club uniform she had been wearing at the time of the abduction was never found. There was duct tape in her hair and markings on her body indicating that she had

been bound with tape around her wrists, arms, ankles, thighs, back, neck and face. There were also tape marks indicating placement over her nose and mouth. She had suffered bruising or abrasions to her face, neck, back and buttocks.

Petitioner lived near the junior high school. On the night of the abduction, he had visited his brother's family, who lived just three quarters of a mile from the school. He left his brother's home between 9:15 P.M. and 9:30 P.M.

The next morning, petitioner left his yellow car parked in front of his home and walked an eighth of a mile to a grocery store. There, petitioner stole a car and drove to the construction site where he worked. Petitioner told his boss that he had suffered a "mild coronary" the previous night and had been treated at a hospital. He further related that, as a result, he would have to quit his job. The boss described petitioner that morning as wide-eyed and very nervous. Petitioner collected his wages and left. Police arrested him later that morning for driving a stolen vehicle.

On September 29, and again on October 4, 1984, police executed search warrants for petitioner's home, where he lived alone, and his car. During the first search, officers found, among other things, a partially packed suitcase in petitioner's home and a used feminine napkin under petitioner's bed. At the time she was abducted, the victim had been menstruating. The used feminine napkin

found in petitioner's home, however, appeared to be of a different type than that found at the victim's home.

A week after the murder, a paper bag was found on the roof of the grocery store located near petitioner's home and near where he stole the car on the morning following the abduction. Inside the bag was a used feminine napkin of the same type found at the victim's home, containing blood of the same type as the victim. The bag also contained a knife, a belt matching markings made on the victim's arms, a fingernail that did not match either petitioner or the victim, several pieces of duct tape, including a wad of tape with hair stuck to it, a garment label, several cigarette butts, and an earring similar to that worn by the victim on the night she was abducted.

At trial, the State presented the testimony of a forensic chemist, Janice Davis. Her testimony linked the victim, the contents of the paper bag, petitioner, his car, the stolen car, and petitioner's home. Among other things, the chemist identified hair similar to the victim's found on and underneath a bed, on a couch, and in the living room in petitioner's home; in a glove found in the stolen car; in petitioner's yellow car; and on the duct tape in the paper bag. In addition, fibers found on the victim's body were similar to carpet fibers taken from petitioner's car, floor mats and his home, including those from an afghan in his living room. Fibers found in petitioner's living room, bedroom, and hair brush, and from the

knife found in the paper bag on the grocery store roof, were similar to fibers taken from pep club uniforms like the one worn by the victim on the night of the abduction. A single limb hair found on the victim was similar to petitioner's limb hair. The chemist testified that, based upon the hair, fiber and serological evidence, she was convinced that the victim had been in petitioner's car and home.

The jury convicted petitioner of first degree murder and kidnaping. During the capital sentencing proceeding, the trial court incorporated all of the guilt phase evidence. In addition, the State presented evidence of petitioner's prior felony convictions for attempted first degree rape, aggravated kidnaping, indecency with a child, assault and battery with a dangerous weapon, child beating, and robbery with a dangerous weapon.

A woman who had previously lived with petitioner also testified concerning an incident when petitioner entered her home, tied her up and stared at her. The woman's daughter testified that petitioner sexually abused her. She also testified concerning an incident during which petitioner awakened the witness, then five or six years old, and her two brothers, then ages four and eight, in the middle of the night, tied them up without clothes and then stared at them while they struggled to get free.

One of petitioner's former wives testified to petitioner's abusive behavior towards her and their children, including incidents when he would tie her up, rape her and then attempt to choke or smother her.

In mitigation, petitioner presented evidence of his regular involvement with his church, his generally polite and kind demeanor, his father's abuse, other incidents of petitioner's abuse of women and children, his significant mental health problems exacerbated by his drinking, and his good behavior while in prison. A defense psychologist specifically testified that petitioner suffers from an incurable borderline personality disorder, primarily due to his father's abuse, but that he could function well in a structured prison environment. The psychologist indicated that petitioner would probably remain a threat if released back into society, but that he did not present a threat to anyone in prison.

The jury found the existence of three aggravating circumstances: petitioner had previously been convicted of a violent felony, he presented a continuing threat to society, and the murder was especially heinous, atrocious or cruel. The jury sentenced petitioner to death on the first degree murder conviction and to 999 years' imprisonment on the kidnaping conviction.

The Oklahoma Court of Criminal Appeals affirmed petitioner's convictions and sentences. See *Moore v. State*, 788 P.2d 387 (Okla. Crim. App. 1990). The United States Supreme Court denied certiorari. *See Moore v. Oklahoma*, 498 U.S.

881 (1990). Petitioner then sought state post-conviction relief, which the Oklahoma Court of Criminal Appeals denied. *See Moore v. State*, 889 P.2d 1253 (Okla. Crim. App. 1995). The United States Supreme Court again denied certiorari. *See Moore v. Oklahoma*, 516 U.S. 881 (1995). Petitioner commenced this proceeding seeking federal habeas relief from his murder conviction and death sentence. *See* 28 U.S.C. § 2254.

II.   APPLICABILITY OF THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996

A. Commencement of Habeas Proceeding

On cross-appeal, respondent argues that the district court erred in finding that the date petitioner filed a request for the appointment of counsel determined the date the habeas corpus action was filed and therefore concluding the Antiterrorism and Effective Death Penalty Act of 1996 (effective April 24, 1996) (AEDPA) did not govern. We agree and hold that the date of filing the petition, not the date of appointment of counsel, was the correct date for determining whether AEDPA governs.

Petitioner filed his request for appointment of counsel on December 22, 1995, pursuant to 21 U.S.C. § 848(q)(4)(B), which provides for the appointment of counsel to indigent prisoners challenging a capital conviction or sentence "[i]n any post-conviction proceeding under [§] 2254." The district court granted the

-8-

request on December 27. Petitioner filed his habeas petition on July 1, 1996. The district court determined that although the habeas petition was filed after the effective date of AEDPA, the request for appointment of counsel, filed pre-AEDPA, actually commenced the proceedings thereby precluding AEDPA's application. [1] The district court relied on *McFarland v. Scott*, 512 U.S. 849 (1994).

In *McFarland*, the Supreme Court held that if a capital defendant invokes his right to appointed counsel under § 848(q)(4), he has a post-conviction proceeding pending and thus need not file a habeas corpus petition before a federal court may enter a stay of execution. *See McFarland*, 512 U.S. at 858-59 (citing 28 U.S.C. § 2251, which permits a federal court to issue a stay "for any matter involved in the habeas corpus proceeding"). *McFarland*, however, recognized that neither the federal habeas corpus statute nor the rules governing

---

[1]    Citing 28 U.S.C. § 2263(a), the district court also determined that if AEDPA applied, the 180-day statute of limitations would bar the habeas claims. That determination was in error because the limitations period set forth in § 2263(a) applies only to capital cases in which a state has adopted certain standards for appointment of counsel. *See* 28 U.S.C. § 2261. Oklahoma has not qualified under these provisions. *See Duvall v. Reynolds*, 139 F.3d 768, 776 (10th Cir.), *cert. denied*, 119 S. Ct. 345 (1998); *Nguyen v. Reynolds*, 131 F.3d 1340, 1345 (10th Cir. 1997), *cert. denied*, 119 S. Ct. 128 (1998). Therefore, the applicable limitations period is set forth in 28 U.S.C. § 2244(d)(1), and the petition was filed timely. *See Miller v. Marr*, 141 F.3d 976, 977 (10th Cir.), *cert. denied*, 119 S. Ct. 210 (1998); *United States v. Simmonds*, 111 F.3d 737, 746 (10th Cir. 1997).

habeas proceedings define a proceeding under § 2254 or state how such a proceeding shall be commenced. *See id.* at 854. The Court also recognized that § 848(q)(4) "indicates that the right to appointed counsel adheres prior to the filing of a formal, legally sufficient habeas corpus petition," because "a 'post conviction proceeding' within the meaning of § 848(q)(4)(B) is commenced by the filing of a death row defendant's motion requesting the appointment of counsel for his federal habeas corpus proceeding." *McFarland*, 512 U.S. at 854-55, 856-57; *see also id.* at 857 n.3 ("preapplication legal assistance" included in § 848(q)(4)(B)). Indeed, the assistance of an attorney may be crucial before the actual filing of the petition. *See id.* at 854-56. The Court then determined that to give meaning to the right to appointed counsel, the district court must be allowed to stay an execution under § 2251, regardless of whether the petitioner had filed a habeas petition. *See McFarland*, 512 U.S. at 858.

Notably, *McFarland* does not hold that appointment of counsel also commences a post-conviction proceeding within the meaning of § 2254. *Cf. Williams v. Cain*, 125 F.3d 269, 274 (5th Cir. 1997) (stating *McFarland* does not determine what date habeas petition is "pending" for applicability of substantive statutes), *cert. denied*, 119 S. Ct. 144 (1998). *McFarland* merely ensured indigent capital defendants the right to counsel established by § 848(q)(4). *See Williams*, 125 F.3d at 274.

-10-

Respondent argues that *Lindh v. Murphy*, 521 U.S. 320 (1997), not *McFarland*, defined AEDPA's applicability. Respondent notes that *Lindh*, 521 U.S. at 326, 327, stated that AEDPA applied to cases filed after its enactment and that AEDPA referred to "'an application for a writ of habeas corpus.'" Br. of Appellee, Cross-Appellant at 7 (quoting 28 U.S.C. §§ 2244(d)(1), 2254(a)). Thus, respondent maintains the date of the request for appointment of counsel does not determine whether AEDPA applies. *Lindh* held that AEDPA did not apply to habeas corpus applications pending when it was passed. *See Lindh*, 521 U.S. at 322-23, 327, 336. *Lindh* did not expressly define when a habeas case is pending for purposes of the applicability of AEDPA.

Although neither *McFarland* nor *Lindh* addressed what constitutes a pending habeas corpus proceeding for purposes of determining the applicability of AEDPA, the majority of circuits considering the issue have held that a case is pending for purposes of AEDPA only when the habeas petition is filed. *See, e.g.*, *Gosier v. Welborn*, 175 F.3d 504, 506 (7th Cir. 1999), *petition for cert. filed* (U.S. July 14, 1999) (No. 99-5282); *Williams v. Coyle*, 167 F.3d 1036, 1037, 1040 (6th Cir. 1999); *Nobles v. Johnson*, 127 F.3d 409, 414 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1845 (1998). Those circuits recognized that *Lindh* and *McFarland* did not address and did not resolve the issue before them and that *McFarland* focused on the need to expand the ordinary meaning of a pending

-11-

case to give effect to Congressional intent. [2] *See Williams*, 167 F.3d at 1038-39; *Holman v. Gilmore*, 126 F.3d 876, 879-80 (7th Cir. 1997); *Nobles*, 127 F.3d at 413-14.

As support for its conclusion that a federal habeas corpus case is filed upon the filing of the habeas petition, the Sixth Circuit looked at the language of 28 U.S.C. § 2254(e) which refers "to a proceeding instituted by an application for a writ of habeas corpus"; 28 U.S.C. § 1914(a) which requires payment of a filing fee upon the filing of an "application for a writ of habeas corpus"; and Rule 1 of the Rules Governing § 2254 Cases which provides that the rules "govern the procedure in the United States district courts on applications under 28 U.S.C. § 2254." *See Williams*, 167 F.3d at 1038. The Seventh Circuit did not disagree that an application for counsel under § 848(q)(4) is a case that may be reviewed by an appellate court. *See Gosier*, 175 F.3d at 506. "But a request for counsel under § 848(q)(4), part of Title 21, is not a case *under Chapter 153 of Title 28* -- that is, the request is not a collateral attack on a criminal judgment." *Gosier*, 175 F.3d at 506. "[T]he motion for counsel is not itself a petition, because it

---

[2]    The Sixth Circuit also pointed out that *McFarland* addressed an ongoing problem, whereas the case before the court presented a question of the effective date of a statutory provision, a question which, in time, will become irrelevant. *See Williams*, 167 F.3d at 1039.

-12-

does not call for (or even permit) a decision on the merits. And it is 'the merits' that the amended § 2254(d)(1) is all about." *Holman*, 126 F.3d at 880.

Unlike the other circuits, the Ninth Circuit defines a pending federal habeas petition more broadly. *See Nino v. Galaza*, 183 F.3d 1003, 1005 (9th Cir. 1999). It has held that a habeas case begins with the appointment of counsel. *See Calderon v. United States Dist. Court for the Cent. Dist. of Cal.*, 163 F.3d 530, 539-40 (9th Cir. 1998) (en banc), *cert. denied*, 119 S. Ct. 1377 (1999). *Calderon* based its decision on *Hohn v. United States*, 524 U.S. 236 (1998). [3] *Hohn* held that an application for a certificate of appealability constituted a case under 28 U.S.C. § 1254, [4] and therefore the Supreme Court had jurisdiction to review a court of appeals' denial of an application for a certificate of appealability. *See Hohn*, 524 U.S. at 238-39, 241, 253. In reaching this decision, *Hohn* looked to *Ex parte Quirin*, 317 U.S. 1, 24 (1942), which held that a district court's denial of a request for leave to file a petition for a writ of habeas corpus was a reviewable case on appeal. *See Hohn*, 524 U.S. at 246.

*Hohn* is distinguishable. We agree with the Sixth Circuit that

---

[3] *Calderon* concluded that *Hohn* overruled prior precedent, which had held that a habeas case is pending only upon the filing of a petition for writ of habeas corpus. *See Calderon*, 163 F.3d at 539-40.

[4] Section 1254 sets forth the methods by which "[c]ases in the courts of appeals may be reviewed by the Supreme Court."

-13-

> *Hohn* and *Ex parte Quirin* stand only for the proposition that the denial by the district court of a motion for the issuance of a [certificate of appealability], a motion for leave to file a petition for the writ, or, as in our case, a motion for the appointment of counsel . . . would constitute an appealable case. This does not imply, however, that the petitioner's *habeas corpus case* has been initiated by the filing of such a preliminary motion. Although the Court in *Hohn* rejected the contention that the filing of a preliminary motion "should be regarded as a threshold inquiry separate from the merits," *Hohn*, [524 U.S. at 246], the holding and logic of the case were limited to the determination that the rejection by the district court of the preliminary motion constitutes an appealable case.

*Williams*, 167 F.3d at 1040; *see also Calderon*, 163 F.3d at 545 (Hall, J., dissenting) (distinguishing *Hohn*'s use of word "case" to interpret whether Supreme Court had jurisdiction from use of word "case" to interpret whether statute of limitations had run under AEDPA).

Accordingly, this court joins the majority of circuits in holding that a case is pending under AEDPA only upon the filing of a petition for writ of habeas corpus. The filing of a request for counsel to prepare a habeas petition does not govern the applicability of AEDPA as it is not a petition seeking substantive relief.

B. Retroactivity

Petitioner argues that if this court holds that the case commenced at the time he filed the habeas corpus petition, it is unconstitutional to retroactively apply the new standards of review set forth in AEDPA to state court proceedings completed before enactment or effectiveness of AEDPA. This court has held to

-14-

the contrary, determining that AEDPA applies to cases filed after its effective date, regardless of when state court proceedings occurred. *See Rogers v. Gibson*, 173 F.3d 1278, 1282 n.1 (10th Cir. 1999); *see also Berget v. Gibson*, No. 98-6381, 1999 WL 586986 (10th Cir. Aug. 5, 1999) (unpublished order and judgment citing *Rogers* and holding that application of AEDPA to cases filed after its effective date is not impermissibly retroactive); *Mueller v. Angelone*, 181 F.3d 557, 565-73 (4th Cir.) (addressing argument similar to that raised here and holding AEDPA does not have impermissible retroactive effect), *cert. denied*, 1999 WL 720053 (U.S. Sept. 16, 1999) (No. 99-6143, 99A222).

C. Standards of Review

The review of a denial of habeas corpus relief is subject to two different types of analysis depending on whether a claim was heard on its merits by the state courts. "If the claim was not heard on the merits by the state courts, and the federal district court made its own determination in the first instance, we review the district court's conclusions of law *de novo* and its findings of fact, if any, for clear error." *LaFevers v. Gibson*, 182 F.3d 705, 711 (10th Cir. 1999). If a claim was adjudicated on its merits by the state courts, a petitioner will be entitled to federal habeas relief only if he can establish that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28

-15-

U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). AEDPA thereby increases the degree of deference afforded to state court adjudications. *See Boyd v. Ward*, 179 F.3d 904, 912 (10th Cir. 1999) (citing *Houchin v. Zavaras*, 107 F.3d 1465, 1470 (10th Cir. 1997)).

Petitioner argues that if AEDPA applies, this court must define the standards of review set forth in § 2254(d)(1). We have applied these standards, but have not defined them, beyond the precise wording of AEDPA. *See Bryson v. Ward*, No. 97-6435, 1999 WL 590738, at n.3 (10th Cir. Aug. 6, 1999) (citing *Matteo v. Superintendent*, 171 F.3d 877, 885-91 (3d Cir. 1999), *petition for cert. filed*, 67 U.S.L.W. 3008 (U.S. June 22, 1999) (No. 98-2050), and *Nevers v. Killinger*, 169 F.3d 352, 357-62 (6th Cir.), *cert. denied*, 119 S. Ct. 2340 (1999), which set forth the various interpretations of the standards of deference afforded state court adjudications under both § 2254(d)(1)'s "contrary to" and "unreasonable application of" language by other federal courts of appeals). The United States Supreme Court has granted certiorari to review the Fourth Circuit's interpretation of these standards. *See Williams v. Taylor*, 119 S. Ct. 1355 (1999); *see also* 67 U.S.L.W. 3608 (Apr. 6, 1999) (listing issues presented). Under any

-16-

possible interpretation of the standards, the outcome of this appeal would be the same. Thus, we decline to interpret the standards in this case. [5]

III.    ALLEGATIONS OF PLANTED EVIDENCE

Petitioner first argues that the district court erred in denying discovery on his claim that police officers planted evidence in his home and car, and did not disclose this fact, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Petitioner asserts that police officers obtained hair from the victim's body and fibers from a pep club uniform similar to the one worn by the victim on the night of the abduction, planted those in his home and car between the first and second searches, and then "discovered" this evidence during the execution of the second search warrant.

To establish a *Brady* violation, petitioner bears the burden of showing that the prosecution suppressed material evidence favorable to petitioner. *See, e.g.*, *Moore v. Reynolds*, 153 F.3d 1086, 1112 (10th Cir. 1998), *cert. denied*, 119 S. Ct. 1266 (1999). Knowledge of police officers or investigators will be imputed to the prosecution. *See Kyles v. Whitley*, 514 U.S. 419, 421, 437 (1995); *Smith v. Secretary of N.M. Dep't of Corrections*, 50 F.3d 801, 824-25 (10th Cir. 1995).

---

[5]    Even under the review afforded pre-AEDPA, we conclude petitioner would not be entitled to any further relief.

-17-

In support of this *Brady* claim, petitioner relies upon the statement of Bruce Hawkins, the mortician who prepared the victim's body for burial. The Oklahoma Court of Criminal Appeals first considered this evidence in the state post-conviction proceeding, determining Hawkins' statement "could not have been discovered with due diligence before trial, and is not cumulative of any evidence presented at trial." *Moore*, 889 P.2d at 1257-58. The court further determined that this new evidence "certainly suggests that Midwest City police followed a somewhat unusual investigative procedure in this case." *Id.* at 1257. Nonetheless, the Oklahoma appellate court declined to hold an evidentiary hearing or conduct any further factual inquiry. That court, instead, assumed the truth of petitioner's factual allegations and denied relief, holding that "mere evidence of unusual conduct on the detectives' part, when evaluated in the context of the entire record, is not material, and does not create a reasonable probability that the trial's outcome would be changed." *Id.* at 1257-58.

The determination of whether undisclosed evidence is material is a mixed question of law and fact reviewed de novo by this court prior to AEDPA. *See United States v. Trujillo*, 136 F.3d 1388, 1393 (10th Cir.) (direct criminal appeal), *cert. denied*, 119 S. Ct. 87 (1998); *see also Newsted v. Gibson*, 158 F.3d 1085, 1094 (10th Cir. 1998) (reviewing de novo *Brady* claim asserted in pre-AEDPA habeas petition), *cert. denied*, 119 S. Ct. 1509 (1999). In this appeal governed by

-18-

AEDPA, therefore, we consider whether the state appellate court's materiality determination amounts to an "unreasonable application" of clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1). We conclude it does.

Suppressed exculpatory evidence will be deemed material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (further quotation omitted); *see also Strickler v. Greene*, 119 S. Ct. 1936, 1948 (1999). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

The State's case against petitioner was entirely circumstantial. The existence and cross-transference of the fiber and hair evidence was crucial to the State's case against him. If proved, petitioner's allegations that police officers planted this evidence, therefore, would be material -- i.e., there is a reasonable probability that the result of the proceeding would have been different.

Petitioner's allegations, therefore, if proved would entitle him to habeas relief. It remains for petitioner to prove the truth of those allegations. We,

-19-

therefore, turn to the question of whether petitioner is entitled to discovery on this claim. *See Bracy v. Gramley*, 520 U.S. 899, 905-06 (1997).

A federal habeas petitioner will be entitled to discovery only "if, and to the extent that, the [district court] judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." Rule 6(a), Rules Governing Section 2254 Cases; *see also LaFevers*, 182 F.3d at 723. "'[W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.'" *Bracy*, 520 U.S. at 908-09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)). Petitioner has met this burden here.

In his statement, Hawkins asserts that two detectives returned to the funeral home on three separate occasions to obtain samples of the victim's pubic, scalp and limb hairs. They apparently returned the second time because, during the first visit, they had cut the hairs, instead of plucking them. On the third occasion, the detectives took up to two and one-half hours to obtain additional evidence.

The trial record corroborates part of Hawkins' statement, indicating that detectives did go to the funeral home several times to obtain additional samples of the victim's hair, after completion of the medical examiner's examination. Detective Marston testified that he and Detective Howard went to the funeral

home on Monday, October 1, 1984, to obtain the victim's fingerprints. Pursuant to the forensic chemist's request, Detective Ingle also went to the funeral home on October 1 to obtain samples of the victim's limb hair.

In his statement, Hawkins further asserts that another funeral home employee, John Boeing, who is now deceased, followed the detectives after their second visit to the funeral home. According to Hawkins, Boeing told him that the detectives went directly from the funeral home to petitioner's home, where one entered through an open window, then unlocked the door from the inside. Hawkins asserts that they had with them a red sweater and the victim's hair samples they had just collected at the funeral home. The detectives remained in petitioner's home for some time, and then subsequently "appeared to be doing things" to petitioner's yellow car, which was parked in front of his home. Later that evening, Hawkins accompanied Boeing to petitioner's home and confirmed that a window remained open.

According to Hawkins, both he and Boeing followed the detectives to petitioner's home after the detectives' third visit to the funeral home. Hawkins asserts that the window to the home was still open at that time.

The record confirms that key hair evidence was not discovered until the second search, on October 4, 1984. In addition, investigators did not discover the red fibers, consistent with pep club uniforms similar to the victim's, until the

second search. Even though no one had seen them during the first search, the forensic chemist discovered these red fibers near the front door of petitioner's home, immediately upon her entry of the home to conduct the second search. During the second search, investigators also discovered similar red fibers located under petitioner's bed, in the same location where, during the first search, a used feminine napkin had been discovered.

At trial, detectives gave contradictory testimony concerning whether they had obtained two or three pep club sweaters to compare with any fibers found. Detectives Howard and Garner both testified that they had obtained three such sweaters, two new and one used, as part of three complete pep club outfits to be used for any necessary comparisons. Detective Garner later testified, however, that he submitted only two sweaters to the forensic chemist for analysis. The forensic chemist testified that she had only requested two sweaters for analysis, one new and one used. No one could account for the whereabouts of the third sweater.

There was also contradictory testimony at trial concerning whether, and in what manner, police officers had secured petitioner's home after the first search. [6]

---

[6] Petitioner's brother testified that he entered petitioner's home on Sunday, September 30, to obtain petitioner's medication. Jail records indicated that petitioner first received his medication on that Sunday. The home appeared to have been searched. There was no evidence tape sealing the trailer, however,

(continued...)

-22-

The trial record, therefore, lends some support and does not contravene petitioner's allegations which, if proved, would warrant habeas relief. In light of those specific allegations, supported by Hawkins's statement, the district court abused its discretion in denying discovery. *See Bracy*, 520 U.S. at 909. We, therefore, remand for limited discovery on this one ground for habeas relief. In remanding, however, we note that "Rule 6(a) makes it clear that the scope and extent of such discovery [remains] a matter confided to the discretion of the District Court." *Bracy*, 520 U.S. at 909.

## IV. EXPERT TESTIMONY OF FORENSIC CHEMIST

Petitioner next argues that the trial court's admission of the expert testimony of the State's forensic chemist, Janice Davis, concerning hair and fiber evidence linking petitioner to the crime, deprived petitioner of due process and a fair trial. On direct appeal, petitioner challenged Davis' testimony only on state law grounds. *See Duncan v. Henry*, 513 U.S. 364, 366 (1995) (per curiam) ("If a

---

[6](...continued)
and a window was open and the doors may or may not have been locked.

On the other hand, Detectives Howard and Garner both testified that petitioner's brother obtained medicine from petitioner's home late afternoon on Friday, September 28. The detectives further testified that they searched petitioner's home on Saturday, September 29, after which Garner secured the home by locking the door and taping the trailer with evidence tape. The tape remained undisturbed until the second search, on October 4.

habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."). Because respondent does not argue that this claim is unexhausted or procedurally barred, however, we address the merits of petitioner's federal claim. *See* 28 U.S.C. § 2254(b)(2) (federal habeas court may deny relief on merits of unexhausted claim); *see also Hooks v. Ward*, No. 98-6196, 1999 WL 502608, at *9 (10th Cir. July 16, 1999) (to be reported at 184 F.3d 1206) (State is obligated to raise procedural default as affirmative defense or lose right to do so).

Because the state courts did not address the federal claim, however, the district court addressed the merits of this issue in the first instance. This court, therefore, reviews the legal conclusions underlying the district court's decision de novo, and any factual findings for clear error. *See LaFevers*, 182 F.3d at 711.

Petitioner is not entitled to federal habeas relief unless "the error, if any, was so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process." *Williamson v. Ward*, 110 F.3d 1508, 1522 (10th Cir. 1997) (pre-AEDPA). The district court determined that any question concerning the admission of Davis' testimony did not rise to the level of a due process violation. Petitioner argues this evidence was unduly prejudicial because it was unreliable, inaccurate or false; the nature of

hair and fiber comparisons is inexact; Davis testified in a biased and subjective manner; and she was "probably" unqualified to testify as an expert.

Hair and fiber comparison evidence is not per se inadmissible. *See id.* at 1522-23 (addressing admissibility of hair analysis evidence). Davis did possess expertise in hair and fiber analysis, having been trained in forensic science generally and having attended several law enforcement training seminars specifically addressing hair and fiber analysis. *See Story v. Collins*, 920 F.2d 1247, 1255 (5th Cir. 1991) (addressing admission of expert testimony concerning sexually abused children). We cannot say that it was fundamentally unfair for the trial court to allow her to testify as an expert. *See Bennett v. Lockhart*, 39 F.3d 848, 857 (8th Cir. 1994).

On cross-examination and in argument before the trial judge, defense counsel ably challenged the hair and fiber evidence, Davis' qualifications, and her testing methods. *See Little v. Johnson*, 162 F.3d 855, 863 & n.11 (5th Cir. 1998) (citing *Barefoot v. Estelle*, 463 U.S. 880, 898-99 (1983)), *cert. denied*, 119 S. Ct. 1768 (1999); *see also Adams v. Leapley*, 31 F.3d 713, 715 (8th Cir. 1994). He also had a defense expert available to guide and inform his cross-examination. *Cf. Little*, 162 F.3d at 863 (counsel could offer rebuttal expert evidence and cross-examine purported state expert).

-25-

Davis, herself, testified that a comparison of hairs could only establish either that the known and unknown hairs were not from the same source, or that the hairs were microscopically similar and, therefore, could have come from the same source. She also stressed that hair comparison could not result in a positive identification.

The trial court instructed the jury that it was to determine the weight to be given any expert testimony. *See Little*, 162 F.3d at 863; *Bachman v. Leapley*, 953 F.2d 440, 442 (8th Cir. 1992). "Because this evidentiary issue was fully and competently aired in the state courts," petitioner has failed to show a "violation of fundamental fairness under the due process clause." *Spence v. Johnson*, 80 F.3d 989, 1000 (5th Cir. 1996).

In support of this federal habeas claim, petitioner submits the affidavit of another hair and fiber expert who further challenges the credibility of Davis' testimony and testing methods. Based upon the affidavit, petitioner asserts he is entitled to discovery on this claim. This evidence, however, was available to petitioner at trial. In addition, he had a defense expert at trial to inform his challenge to this evidence. *Cf. Siripongs v. Calderon*, 167 F.3d 1225, 1227-28 (9th Cir. 1999) (rejecting habeas claims based upon opinion of newly hired defense expert, where test results were available and reviewed by defense expert prior to trial). Petitioner, therefore, has failed to establish good cause for

discovery on this issue. *See* Rule 6(a), Rules Governing Section 2254 Cases; *see also Bracy*, 520 U.S. at 908-09.

## V.     REMOVAL OF VENIRE MEMBER

Petitioner argues the trial court violated his Sixth, Eighth, and Fourteenth Amendment rights by improperly removing a venire member for cause without allowing him an opportunity to rehabilitate the juror. [7] "'[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 420 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)) (emphasis omitted). A trial judge's determination of a potential juror's bias under this standard is a factual finding entitled to a presumption of correctness. *See id.* at 428-29 (pre-AEDPA); *Davis v. Executive Dir. of Dep't of Corrections*, 100 F.3d 750, 777 (10th Cir. 1996) (same); *see also Pitsonbarger v. Gramley*, 141 F.3d 728, 734 (7th Cir.) (applying AEDPA), *cert. denied*, 119 S. Ct. 448 (1998); *Fuller v. Johnson*, 114 F.3d 491, 500-01 (5th Cir. 1997) (same). In making such a determination, the trial judge must assess the credibility of the

---

[7]     Contrary to the district court's opinion, petitioner did assert in district court a Sixth Amendment violation.

-27-

prospective juror, a task an appellate court cannot easily do based upon a record.

*See Witt*, 469 U.S. at 429;  *see also  Castro v. Ward* , 138 F.3d 810, 824 (10th Cir.)

("Because issues of credibility and demeanor are crucial to the trial judge's

determination, our review of that determination is quite deferential."),          *cert.*

*denied* , 119 S. Ct. 422 (1998).

Petitioner argues that a juror who opposes the death penalty may not be

excused for cause if he is able to follow the trial judge's instructions and set

aside his own beliefs in deference to the law.  Here, petitioner maintains the trial

judge did not properly question the prospective juror to determine whether he

could do so.  The following colloquy occurred:

> THE COURT:  Mr. Parrish, I will ask you, the defendant in this case is charged with murder in the first degree.  It is your duty to determine whether the defendant is not guilty or guilty of murder in the first degree.
>
> The law provides that the punishment for murder in the first degree is life or death.  If you find beyond a reasonable doubt that the defendant is guilty of murder in the first degree, can you consider both legal punishments, life or death?
>
> MR. PARRISH:  No.
>
> THE COURT:  Let me ask you this question, sir.  If you found beyond a reasonable doubt that the defendant was guilty of murder in the first degree and if, under the evidence, facts and circumstances of the case, the law would permit you to consider a sentence of death, are your reservations about the death penalty such that regardless of the law, the facts and circumstances of the case, you would not consider inflicting the death penalty?

MR. PARRISH: Yes.

Tr. vol. I at 60-61. After the prosecution moved to excuse the juror, defense counsel asked for a bench conference, during which he requested an opportunity to further question the juror.

> MR. RAVITZ: Judge, we contend that two questions can not properly determine a juror's feelings, and if we're not allowed to explore, this Court can not make any type of factual judgment on it.
>
> We would request that we be permitted to ask the juror -- explain to the juror the law, the fact that all he is required to do is consider the death penalty, that this defendant is entitled to a representative jury of his peers, that if the juror wants to consider it and reject it, he has that right to do it as long as he's willing to consider it.
>
> That as long as he is willing -- as long as it will not affect his decision on guilt or innocence, he has a right to sit on it. If you don't let me inquire on this, we can't make -- this record will be totally insufficient for an appellate court to review whether this Court was correct in excusing him.
>
> When I finish, the Court may be entirely correct in excusing, but I think I'm entitled to that opportunity.

Id. at 62-63. The trial court overruled defense counsel's request and excused the juror. [8]

---

[8] Thereafter, counsel made a record of the additional questions he would have asked the prospective juror if the trial court had allowed him to do so. The following is illustrative of the record trial counsel made.

> Judge, . . . this juror has to at least be asked, can he set aside his opinions and follow the law, because if he can, he can sit on this
>
> (continued...)

On direct criminal appeal, the Oklahoma Court of Criminal Appeals held that the juror was properly excluded under *Witt* because the trial court's questioning established he would not consider imposing the death penalty in a proper case. *See Moore*, 788 P.2d at 397. That court determined the trial court did not err in disallowing further questioning by defense counsel, because further questioning may have resulted in confusion and the relevant questions had been asked and clearly answered. *See id.*

Petitioner contends that the second question asked by the trial court "is virtually identical to a question this Court described as 'confusing, and because of its negative phrasing, invites ambiguous answers.'" Appellant's Opening Br. at 44 (quoting *Davis v. Maynard*, 869 F.2d 1401, 1408 (10th Cir. 1989), *vacated on other grounds by Saffle v. Davis*, 494 U.S. 1050 (1990), *opinion reinstated in part by Davis v. Maynard*, 911 F.2d 415, 418 (10th Cir. 1990)). The following question was at issue in *Davis*:

---

[8](...continued)
jury. And none of those questions ever asked that.

> We contend that the Supreme Court's standard in Witt and Witherspoon is being totally violated by an excusal without giving me an opportunity to ask these questions because we believe this juror, if assured of his civic responsibility, would in fact say he could sit on this jury and do what he thinks is proper in the case.

Tr. vol. I at 64-65.

-30-

> If you found beyond a reasonable doubt that the Defendant in this case was guilty of Murder in the First Degree and if under the evidence, facts and circumstances of the case the law would permit you to consider a sentence of death, are your reservations about the Death Penalty such that regardless of the law, the facts and the circumstances of the case, you would not inflict the Death Penalty?

*Davis*, 869 F.2d at 1408. This court determined that a "no" answer to this question could ambiguously mean either that the juror could not inflict the death penalty despite the law and evidence or that any reservations the juror had would not impair the juror's ability to inflict the proper sentence. *See id.* at 1408-09. [9] *Davis*, however, refused to conclude that the exclusion of the juror for cause was reversible error. *See id.* at 1409.

In so refusing, *Davis* looked to *Witt* where the Supreme "Court established that prospective jurors' bias towards the death penalty need not be proved with 'unmistakable clarity'" in order to excuse a juror for cause. *Id.* (quoting *Witt*, 469 U.S. at 424).

> This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack

---

[9]     In *Davis*, defense counsel asked a follow-up question: "Do I hear that to mean that you could possibly impose the Death Penalty in some particular case?" *Id.* at 1408. The juror responded "yes." *Id.*

> of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . .[T]his is why deference must be paid to the trial judge who sees and hears the juror.

*Witt*, 469 U.S. at 424-26 (footnote omitted). Thus, even where there is ambiguity, the trial court, aided by its assessment of the juror's credibility, may resolve the ambiguity in favor of the State. *See id.* at 434.

Nor do we believe the trial court was required to afford petitioner an opportunity to further examine and rehabilitate the juror. "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). Here, the voir dire was adequate to detect whether the prospective juror would have been qualified to serve as a juror. *See Yeatts v. Angelone*, 166 F.3d 255, 265 (4th Cir.) (corollary of right to impartial jury is requirement of voir dire sufficient to identify unqualified jurors), *cert. denied*, 119 S. Ct. 1517 (1999). Thus, the trial court was not constitutionally required to grant defense counsel an opportunity to conduct a searching inquiry. *Cf. Sellers v. Ward*, 135 F.3d 1333, 1341 (10th Cir.) (where defense attorney wanted to inquire whether prospective jurors would find specific facts mitigating), *cert. denied*, 119 S. Ct. 557 (1998). The trial court's decision not to permit further questioning by defense counsel did not exceed the bounds of that court's considerable discretion. *See Neely v. Newton*,

-32-

149 F.3d 1074, 1083-84 (10th Cir. 1998) (holding federal courts are deferential to what questions should be asked), *cert. denied*, 119 S. Ct. 877 (1999). Even assuming additional questions would have been helpful, the trial court's failure to allow defense counsel to ask the questions did not render the trial fundamentally unfair. *See id.* at 1084.

Petitioner has failed to rebut the presumption the trial court was correct in finding that the juror's views would have prevented or substantially impaired his performance of his duties as a juror. The Oklahoma Court of Criminal Appeals' determination that the juror's answers clearly indicated that he could not consider imposing the death penalty regardless of the evidence and the instructions was not contrary to or an unreasonable application of *Witt*.

## VI. PROSECUTORIAL MISCONDUCT

Petitioner alleges the prosecution engaged in misconduct at both stages of his trial by: 1) eliciting sympathy for the victim; 2) vouching for the credibility of state witnesses; 3) stating personal opinion about petitioner's guilt; and 4) undermining the jury's sense of responsibility in selecting the appropriate punishment. On direct criminal appeal, petitioner raised only the first claim and did so only on state law grounds. The Oklahoma Court of Criminal Appeals determined that state law was not violated. *See Moore*, 788 P.2d at 401. On

post-conviction, petitioner raised all four claims, doing so on state law grounds with respect to the first three and on federal grounds with respect to the fourth. Without citing state or federal law, the Oklahoma Court of Criminal Appeals recognized that the prosecutor's comments occasionally skirted the boundaries of permissible argument, but considered in the context of the entire closing arguments, did not require reversal or modification. The court determined the prosecutor primarily made permissible comments based on the evidence or merely responded to defense counsel's closing arguments. *See Moore*, 889 P.2d at 1255 n.4.

Because respondent does not argue petitioner failed to exhaust the first three claims on federal grounds and does not argue procedural bar with respect to all four claims, we address the merits of all claims. *See* 28 U.S.C. § 2254(b)(2) (permitting federal court to deny relief on merits of unexhausted claim); *Hooks*, 1999 WL 502608, at *9 (holding State must raise procedural bar or it is waived).

The federal district court addressed the merits of the first three claims on federal law grounds in the first instance. We review the district court's legal conclusions de novo and its factual findings for clear error. *See LaFevers*, 182 F.3d at 711. We assume the state appellate court reviewed the merits of the fourth claim under federal law, as petitioner requested. Accordingly, we review

-34-

the Oklahoma Court of Criminal Appeals determinations on the fourth claim for reasonableness. *See* 28 U.S.C. § 2254(d)(1).

Allegations of prosecutorial misconduct are mixed questions of law and fact. *See Fero v. Kerby*, 39 F.3d 1462, 1473 (10th Cir. 1994). Not every improper and unfair remark made by a prosecutor will amount to a federal constitutional deprivation. *See Caldwell v. Mississippi*, 472 U.S. 320, 338 (1985). A prosecutor's improper comment or argument will require reversal of a state conviction only where the remarks sufficiently infect the trial so as to make it fundamentally unfair and, therefore, a denial of due process. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 645 (1974); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Hoxsie v. Kerby*, 108 F.3d 1239, 1243 (10th Cir. 1997).

Inquiry into the fundamental fairness of a trial can be made only after examining the entire proceedings. *See Donnelly*, 416 U.S. at 643.

> To view the prosecutor's statements in context, we look first at the strength of the evidence against the defendant and decide whether the prosecutor's statements plausibly could have tipped the scales in favor of the prosecution. . . . We also ascertain whether curative instructions by the trial judge, if given, might have mitigated the effect on the jury of the improper statements. . . . When a prosecutor responds to an attack made by defense counsel, we evaluate that response in light of the defense argument. . . . Ultimately, we must consider the probable effect the prosecutor's [statements] would have on the jury's ability to judge the evidence fairly.

*Fero*, 39 F.3d at 1474 (quotations omitted). With these standards in mind, we turn to petitioner's individual claims of prosecutorial misconduct.

-35-

A. Eliciting Sympathy for the Victim

Petitioner first argues that during closing arguments at both stages, the prosecution sought to ensure a conviction and death sentence by appealing to the emotions of the jury and attempting to elicit sympathy for the victim. During the first stage closing arguments, the prosecutor referred to the victim by a nickname not supported by the evidence. Also, the prosecutor asked the jury to speculate about what may have happened to the victim, despite admitting that he did not know exactly what happened to her, and commented on the suffering of the victim's family. [10] During the second stage, the prosecution continued with its pleas for victim sympathy by speculating about what happened to the victim and her responses, pointing out the loss to her family, stating petitioner gets the benefit of the doubt but the victim did not despite her innocence, and stating that

---

[10] The prosecutor made the following comments: 1) "Did he have this knife in his hand then or did he pull it out when he got in the car?" 2) "[F]rom th[e] time [he got her inside the car] until her bruised, battered and lifeless little body was found the next morning beside the road, we don't know exactly what he did to her." 3) "We have a pretty good idea of some of the things he did." 4) "She was probably scared to death and struggling." 5) "She died in order for this baby killer to satisfy his own sadistic sexual desires." 6) "Can you imagine what that baby was going through? Took her out to his trailer, taped her up with that tape, took that knife right there and cut that uniform off of her and kept her there for hours." 7) "Jenipher will never be a teenager." 8) "[Her mom] is never going to drive her to school again." 9) "[The victim's family] will never be the same".

a death verdict was proper out of love for the victim and her parents and the past and the future victims of petitioner. [11]

To the extent the prosecutor speculated about what petitioner did to the victim, the federal district court determined the comments were a tenable explanation based on evidence and logical inferences from the evidence. With respect to the comments about the suffering of the victim's mother and family, the federal district court determined the comments were improper, but petitioner failed to show the comments were so egregious as to render the trial fundamentally unfair, especially in light of the overwhelming evidence of guilt and the jury instructions regarding sympathy.

---

[11]    The prosecutor made the following comments:  1) "[W]e don't really know what he did to her that evening." 2)    "Can you imagine the terror, the fear that baby girl had when he snatched her.  She cried for help there in the parking lot.  And those may well have been the last words that ever came out of her mouth."  3) "What must have been going through that little girl's mind when he trussed her up with duct tape everywhere? . . . And cut the clothing off her body." 4) "Nobody should have to go through the kind of terror he put that little girl through[.]"  5) "She was alone and scared and helpless, and she died in silence with his hands around her neck."  6) "The sort of pain and fear she experienced must be unimaginable."  7) "Can [the victim's parents] ever visit [her]?" 8) "We're giving him every benefit of the doubt, every right our justice system prevails.  Jenipher didn't get any of those."  9) "She was totally innocent." 10) "There's no way little Jenipher could have been more innocent or less deserving of what happened to her on that night."  11) "[B]ring back a death verdict out of love for the [victims and parents] of the world and the future and the past victims of [petitioner]."

This court does not condone prosecutorial remarks encouraging the jury to allow sympathy to influence its decision. *See Duvall*, 139 F.3d at 795. After reviewing the record, however, we cannot conclude the comments affected the outcome at either stage of trial. The prosecution's speculations about what happened to the victim were reasonable possible inferences based on the evidence. *Cf. Hooks*, 1999 WL 502608, at *15 (references not "so far off the actual evidence nor so central to the prosecutor's case that they were likely to have affected the jury's verdicts"). The State's evidence makes it probable that the murder of the young victim produced sympathy before the prosecution made any closing remarks. *See Duvall*, 139 F.3d at 795. "Some emotion is inevitable in capital sentencing[,]" and the prosecutor's appeals to emotion in this case were not sufficient to render the argument improper. *Coleman v. Brown*, 802 F.2d 1227, 1239 (10th Cir. 1986).

The trial court instructed the jury at both stages to consider the evidence and testimony received at trial and not to allow sympathy to enter into its deliberations. These instructions, which the jury presumably followed, helped to mitigate the effect on the jury of any possible improper prosecutorial statements. *See Fero*, 39 F.3d at 1474.

-38-

In light of the evidence and the instructions, this court is not persuaded that the prosecution's remarks denied petitioner a fair trial or his right to due process.

B. Vouching for the Credibility of State Witnesses

In responding to the petitioner's claim that evidence had been planted, the prosecutor apologized, on behalf of the State, to the officers who worked on the case, "the men who go out and work the streets and try to make this society safe." According to petitioner, the prosecution was attempting to make the jurors feel a debt of gratitude to these officers, who had been wronged by petitioner's challenge to their testimony. In addition, petitioner challenges the prosecutor's comment that petitioner's attack on the searches was an attack on both himself and another prosecutor. The federal district court determined that there had been no improper vouching, as the first instance was grandstanding and the second was merely skirting the boundaries, but did not warrant relief.

Generally, prosecutors should not personally vouch for the credibility of state witnesses or place their own integrity and credibility in issue. *See Hopkinson v. Shillinger*, 866 F.2d 1185, 1209 (10th Cir.), *reh'g on other grounds*, 888 F.2d 1286 (10th Cir. 1989). Here, however, the statements were made in response to comments of defense counsel. *See Darden*, 477 U.S. at 182; *see also Hopkinson*, 866 F.2d at 1210 (recognizing that improper statement made

-39-

in response to defense counsel's arguments does not make statement proper, but it may affect context in which jury views improper statement). Also, the statements were made in isolation. *See Donnelly*, 416 U.S. at 647 (determining court should not lightly infer prosecutor intended isolated, ambiguous remark to have most damaging meaning or that jury will draw that meaning from other less damaging interpretations); *see also United States v. Ludwig*, 508 F.2d 140, 143 (10th Cir. 1974) (reversing conviction in direct criminal appeal where prosecutor vouched for integrity of state police and vouching was not isolated incident). Nor did the prosecutor cross the line from advocate to witness with these isolated statements. Furthermore, the trial court instructed the jury to consider the evidence in the case in making its decision. We conclude the remarks, viewed in the context of the entire trial, did not prejudice petitioner by influencing the jury to stray from its responsibility to be fair and unbiased. *See United States v. Young*, 470 U.S. 1, 12, 18 (1985).

C. Expressing Personal Opinion About Petitioner's Guilt

The prosecutor told the jury the odds that petitioner committed the crime are a quarter of a million to one. Petitioner argues that this statement jeopardized his right to be tried based on the evidence presented and instead indicated the jury should trust the government's judgment over its own view of the evidence. *See id.* at 18-19.

-40-

The federal district court determined this comment did not implicate any due process violations. *See Duvall*, 139 F.3d at 794. Although the prosecutor should not have expressed his personal opinion regarding guilt, there is no suggestion that, in doing so, he relied on evidence beyond that presented at trial. *See Young*, 470 U.S. at 19. Moreover, the prosecutor also remarked that the jury should find petitioner guilty based on the evidence and not because the prosecution said he was guilty.

D. Undermining Jury's Responsibility in Selecting Punishment

The prosecutor stated in his second stage closing argument that when he files a bill of particulars and asks for the death penalty, it is a proper case for the death penalty. [12] Also, he informed the jury it is "only one piece, one little cog in the community." Additionally, the prosecutor told the jury that

> before any case can be presented to you for your consideration in terms of what sentence is appropriate in that sentence, a number of things have to happen.
>
> The decision--the evidence has to be brought before you upon which you can base that decision. It would be improper for you to go in that jury room and bring back a decision without having the proper evidence before you, as Mr. Deason and I have done.

---

[12] "[Petitioner's counsel] says in 40 capital cases you hear that this is a proper case for the death penalty 40 times. That's right. That's what a capital case is. That's when I file the bill of particulars and ask for the death penalty. That's not in every first degree murder case."

-41-

Prior to that time, decision has to be made as to what penalty will be sought in that case. That decision is then made.

Prior to that time, before that kind of decision can be made, an investigation has to be made by the police department--

. . .

--in this case. And the evidence has to be brought forth. That evidence has to be gathered. It was done in this case.

Before that. Before that evidence can be gathered, the one person who voluntarily enters into this whole scene is [petitioner] . . . .

Tr. vol. VII at 1626-27. Petitioner believes that these statements violated *Caldwell* and were designed to make the jury surrender its judgment to the judgment of the prosecution and law enforcement, rather than to make a decision based on the strength of the evidence.

On post-conviction review, the Oklahoma Court of Criminal Appeals, apparently deciding petitioner's *Caldwell* argument, determined that these comments merely responded to petitioner's counsel's second stage closing argument. *See Moore*, 889 P.2d at 1255 n.4. The federal district court determined that defense counsel invited these comments by his own comments regarding petitioner's continuing threat to society, [13] petitioner's disease, [14] the

---

[13] "If we were going to let [petitioner] out tomorrow, he would be a threat."

[14] "[D]o you really want to kill [petitioner] or do you really want to kill the disease."

social and personal consequences of the jury's decision, [15] and the types of cases appropriate for the death penalty. [16] Further, the district court determined the remarks did not place the ultimate sentencing decision on anyone other than the jury. *See Caldwell*, 472 U.S. at 328-29. The court believed that the comments merely underscored the jury's part in the system of justice. *See Dutton v. Brown*, 812 F.2d 593, 597 (10th Cir. 1987).

The prosecutor's statements viewed in the context of the entire trial did not affirmatively mislead the jury regarding its responsibility for determining punishment, and thus did not violate *Caldwell*. *See Romano v. Oklahoma*, 512 U.S. 1, 8-9 (1994). Furthermore, the trial court's instructions informed the jury that it had the duty to determine the penalty to be imposed. We conclude the prosecutor's statements did not render the death penalty verdict unreliable. *See Sellers*, 135 F.3d at 1343 (prosecutor's suggestion that he personally approved of death penalty and statements that "many hurdles had to be jumped before a capital murder trial could ever occur" were insufficient to suggest that anyone other than jury had burden to make ultimate sentencing decision); *see also Moore*, 153 F.3d at 1113 (prosecutor's comments that jury was small part of

---

[15] "Taking someone's life . . . has the greatest personal and social consequences in one's lifetime."

[16] Defense counsel stated "if you sat on 40 capital juries, you would hear it 40 times" and gave examples of what he believed were proper cases for the death penalty.

machinery to put petitioner on death row and prosecutor made decision to seek death penalty, even if improper, were not significant enough to influence jury's sentencing decision); *Parks v. Brown*, 840 F.2d 1496, 1503-04 (10th Cir. 1987) (prosecutor's comments did not minimize importance of jury's role in fixing sentence), *rev'd on other grounds by Saffle v. Parks*, 494 U.S. 484 (1990). Petitioner has failed to show the Oklahoma Court of Criminal Appeals' decision was contrary to or an unreasonable application of *Caldwell*. *See* 28 U.S.C. § 2254(d)(1).

E. Combined Impact of Comments

Even if the prosecutor's comments viewed in isolation do not warrant relief, petitioner maintains that their combined impact does. "'Cumulative-error analysis applies where there are two or more actual errors. It does not apply, however, to the cumulative effect of non-errors.'" *Castro*, 138 F.3d at 832 (quoting *Hoxsie*, 108 F.3d at 1245); *see Newsted*, 158 F.3d at 1097 ("A non-error and a non-prejudicial error do not cumulatively amount to prejudicial error."). This court has considered, in context, each of the alleged instances of prosecutorial misconduct identified by petitioner and concludes that, even when taken together, the comments did not render petitioner's trial fundamentally unfair.

VII.  ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL AGGRAVATING
CIRCUMSTANCE

In his fifth ground for habeas relief, petitioner challenges the

constitutionality of Oklahoma's "especially heinous, atrocious or cruel"

aggravating circumstance.  In his sixth argument, petitioner asserts that there was

insufficient evidence to support the jury's finding the existence of this aggravator.


A.     Constitutionality

The constitutionality of an aggravating circumstance is a question of law.

*See, e.g.* , *Hooks* , 1999 WL 502608, at *32.  The Oklahoma Court of Criminal

Appeals' rejection of this claim was neither contrary to, nor an unreasonable

application of, clearly established Supreme Court precedent.     *See* 28 U.S.C.

§ 2254(d)(1).

The language of Oklahoma's "especially heinous, atrocious or cruel"

aggravating circumstance is unconstitutionally vague without further narrowing.

*See  Maynard v. Cartwright*  , 486 U.S. 356, 363-64 (1988).  The trial court,

however, did further narrow the application of this aggravator by instructing the

jury that

> [t]he term "heinous" . . . means extremely wicked or shockingly evil.
> "Atrocious" means outrageously wicked and vile.  "Cruel" means
> pitiless or designed to inflict a high degree of pain, utter indifference
> to or enjoyment of the suffering of others.  You are further instructed
> that the phrase "especially heinous, atrocious or cruel" is direct[ed]

to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse.

Post-Conviction R. vol. II at 252.

The first part of this instruction, by itself, insufficiently narrowed the application of this aggravator. *See Shell v. Mississippi*, 498 U.S. 1, 1 (1990) (per curiam); *id.* at 2 (Marshall, J., concurring) (setting forth language of challenged instruction). Nonetheless, the last sentence did constitutionally narrow this aggravating circumstance. *See Walton v. Arizona*, 497 U.S. 639, 652-55 (1990) (plurality) (upholding limiting application of "especially heinous, cruel, or depraved" aggravating factor to murders involving mental anguish or physical abuse occurring prior to death); *see also, e.g.*, *Hooks*, 1999 WL 502608, at *33-*34 (upholding constitutionality of jury instruction identical to instruction challenged here); *LaFevers*, 182 F.3d at 720-21 (same); *Cooks v. Ward*, 165 F.3d 1283, 1290 & n.3 (10th Cir. 1998) (same), *petition for cert. filed* (U.S. May 14, 1999) (No. 98-9420). Further, the instruction's use of the "direct[ed] to" language does not result in any ambiguity.

Petitioner next argues that the Oklahoma Court of Criminal Appeals has interpreted this aggravating circumstance inconsistently and that this inconsistency deprived petitioner of adequate notice. Federal habeas review of the consistency with which state courts have applied an aggravating circumstance, however, is inappropriate. *See Arave v. Creech*, 507 U.S. 463, 477 (1993); *see*

-46-

*also Walton*, 497 U.S. at 655-56. In any event, Oklahoma courts have consistently applied this aggravator. *See, e.g.*, *LaFevers*, 182 F.3d at 721; *Cooks*, 165 F.3d at 1290.

Petitioner argues that, although the Oklahoma Court of Criminal Appeals further limits the application of this aggravating circumstance to crimes in which the victim consciously suffered "serious physical abuse," the jury was never instructed on the need to find conscious suffering. Petitioner also asserts that the trial court failed to instruct that, under Oklahoma law, jurors were first to determine whether the victim suffered torture or serious physical abuse and then, if so, whether the crime was "especially heinous, atrocious or cruel."

These arguments primarily implicate only state law errors. *See Lewis v. Jeffers*, 497 U.S. 764, 783 (1990). "[F]ederal habeas review of a state court's application of a constitutionally narrowed aggravating circumstance is limited, at most, to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation." *Id.* at 780 (pre-AEDPA). "A state court's finding of an aggravating circumstance in a particular case . . . is arbitrary or capricious if and only if no reasonable sentencer could have so concluded." *Id.* at 783; *see also Creech*, 507 U.S. at 478. As discussed more fully below, that is not the case here.

B.    Sufficiency of Supporting Evidence

-47-

Petitioner asserts that there was insufficient evidence to support the jury's finding the existence of this aggravating circumstance. The Oklahoma Court of Criminal Appeals rejected this claim as well. *See Moore*, 788 P.2d at 401-02.

The appropriate standard of review of this claim "is the 'rational factfinder' standard established in *Jackson v. Virginia*, 443 U.S. 307 . . . (1979) . . . whether, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the [aggravating circumstance] beyond a reasonable doubt.' [*Id.*] at 319." *LaFevers*, 182 F.3d at 723. Prior to AEDPA, a habeas claim challenging the sufficiency of evidence under *Jackson* presented a question of law. *See, e.g.*, *Romero v. Tansy*, 46 F.3d 1024, 1032 (10th Cir. 1995). *But cf. Bryson*, 1999 WL 590738 (post-AEDPA habeas claim raising question of whether there was sufficient evidence to instruct jury on lesser included offense in capital case presented factual issue). Under AEDPA, if the sufficiency of evidence is treated as a question of law, then under § 2254(d)(1), the question is whether the Oklahoma Court of Criminal Appeals unreasonably applied this standard.

Nonetheless, it appears that this court has, at times, treated the question of whether there was sufficient evidence to support the sentencer's finding the existence of an aggravating circumstance as a factual determination. *See, e.g.*, *Hooks*, 1999 WL 502608, at *32, *34 (noting Oklahoma Court of Criminal

-48-

Appeals "found" there was sufficient evidence to support sentencer's finding of aggravating circumstances and affirming district court's "finding" that especially heinous aggravator's "serious physical abuse" standard had been met; although also noting Oklahoma Court of Criminal Appeals "concluded" evidence was sufficient); *Ross v. Ward*, 165 F.3d 793, 800-01 (10th Cir. 1999) ("find[ing]" record contained sufficient evidence to support jury's finding of aggravating circumstances), *petition for cert. filed* (U.S. July 6, 1999) (No. 99-5138); *Nguyen*, 131 F.3d at 1344 (noting Oklahoma Court of Criminal Appeals "found" evidence was insufficient to support especially heinous aggravator). At other times, this court has treated the resolution of this issue as a legal conclusion. *See, e.g.*, *Foster v. Ward*, 182 F.3d 1177, 1194-95 (10th Cir. 1999) ("conclud[ing]" record supported jury's finding of conscious physical suffering sufficient to establish Oklahoma's especially heinous aggravator); *LaFevers*, 182 F.3d at 723 (affirming district court's conclusion that there was sufficient evidence for rational trier of fact to have found aggravating circumstance beyond reasonable doubt); *Cooks*, 165 F.3d at 1290 ("conclud[ing]" record supported jury's finding of aggravating circumstance).

If we treat the issue of the sufficiency of the evidence supporting the sentencer's finding of the "especially heinous, atrocious or cruel" aggravating circumstance as a legal determination, the question for our consideration, under

-49-

28 U.S.C. § 2254(d)(1), would be whether the state court's rejection of this claim was contrary to or an unreasonable application of clearly established Supreme Court precedent. On the other hand, if we treat this issue as one of fact, the applicable inquiry under § 2254(d)(2) would be whether the state court's rejection of this claim represented an unreasonable determination of the facts in light of the evidence. Further, § 2254(e)(1) requires this court to afford a presumption of correctness to a state court's factual findings, unless petitioner can rebut that presumption with clear and convincing evidence. In this case, however, we need not determine which is the more appropriate analysis because petitioner's claim lacks merit under either line of reasoning.

At the time of the abduction, petitioner held his hand across the victim's mouth and hit her across the face, knocking her back into the car. At the time her body was found, at 11:00 A.M. the next morning, she had been dead only a few hours. In the interim, she had been bound with duct tape around her wrists, arms, ankles, thighs, back, neck and face, and tape had been placed over her nose and mouth. Her clothes had been removed, her underwear pulled down on her thighs, and her bra pulled up above her breasts. On several prior occasions, petitioner had bound children in order to watch them struggle to get free.

Further, the victim had suffered bruising or abrasions to her face, neck, back and buttocks, and had been strangled and suffocated. The medical examiner

testified that her face was puffy and smeared with pinkish foam coming mainly from her mouth while she was still alive. Her face and eyes exhibited numerous small hemorrhages as a result of the compression of the veins in her neck. This evidence was sufficient to support the jury's finding that this murder was "especially heinous, atrocious or cruel." *See, e.g.*, *Cooks*, 165 F.3d at 1290.

## VIII. CONTINUING THREAT AGGRAVATING CIRCUMSTANCE

Petitioner next argues that Oklahoma's continuing threat aggravating circumstance is unconstitutionally vague and overbroad. Petitioner asserted this claim to the Oklahoma Court of Criminal Appeals only in a petition for rehearing following his direct criminal appeal. The Oklahoma Court of Criminal Appeals denied rehearing without comment. Although respondent argues that this claim is unexhausted and procedurally barred, because this issue is so easily resolved, we address its merits. We have previously rejected this same argument challenging the constitutionality of Oklahoma's continuing threat aggravating circumstance. *See Castro*, 138 F.3d at 815-17; *see also Hooks*, 1999 WL 502608, at *32; *Foster*, 182 F.3d at 1194; *LaFevers*, 182 F.3d at 720; *Boyd*, 179 F.3d at 922.

Petitioner further contends that Oklahoma has not consistently applied this aggravator. A federal habeas court, however, may not address the consistency of

the state courts' application of an aggravating factor. *See, e.g.*, *Creech*, 507 U.S. at 477.

## IX.  INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner argues that the district court erred in denying relief on his four claims of ineffective assistance of trial counsel and two claims of ineffective assistance of appellate counsel.  The Oklahoma Court of Criminal Appeals, deciding one claim of ineffective assistance of trial counsel on its merits, and the federal district court, deciding all other claims of ineffective assistance of trial and appellate counsel on their merits in the first instance, held that neither trial nor appellate counsel rendered constitutionally ineffective assistance of counsel.

Because respondent does not argue petitioner failed to exhaust any claims or that any claims are procedurally barred, *see* 28 U.S.C. § 2254(b)(1) (exhaustion); *Hooks*, 1999 WL 502608, at *9 (procedural bar), we review the claim decided by the Oklahoma Court of Criminal Appeals under the standards set forth in 28 U.S.C. § 2254(d) and the remainder of the claims de novo, *see LaFevers*, 182 F.3d at 711.

A.  Ineffective Assistance of Trial Counsel

Claims of ineffective assistance of counsel are mixed questions of law and fact, reviewed de novo.  *See Miller v. Champion*, 161 F.3d 1249, 1252, 1254

(10th Cir. 1998) (applying AEDPA). To establish ineffective assistance of counsel, a petitioner must prove 1) counsel's performance was deficient, such that counsel made errors so serious that counsel was not acting as the counsel guaranteed by the Sixth Amendment and 2) counsel's deficient performance prejudiced the defense, depriving the petitioner of a fair trial with a reliable result. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To succeed under the first prong, a petitioner must overcome the presumption that counsel's conduct was constitutionally effective. *See Boyd*, 179 F.3d at 914. Specifically, a petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (quotation omitted). For counsel's performance to be constitutionally ineffective, it must have been completely unreasonable, not merely wrong. *See Hoxsie*, 108 F.3d at 1246.

Under the second prong, a petitioner must show that, but for counsel's errors, the result of the proceedings would have been different. *See Strickland*, 466 U.S. at 694. If the alleged ineffective assistance occurred during the guilt stage, the question is whether there is a reasonable probability the jury would have had reasonable doubt regarding guilt. *See id.* at 695. In assessing prejudice, this court looks at the totality of the evidence, not just the evidence helpful to the petitioner. *See Boyd*, 179 F.3d at 914. If the alleged ineffective

-53-

assistance of counsel occurred during the sentencing phase, this court considers whether there is a "reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

"This court may address the performance and prejudice components in any order, but need not address both if [petitioner] fails to make a sufficient showing of one." *Cooks*, 165 F.3d at 1292-93; *see also Davis*, 100 F.3d at 760.

Petitioner alleges four instances of ineffective assistance of trial counsel. First, he argues that counsel did little to demonstrate Janice Davis' lack of training or experience in hair and fiber analysis. If counsel had done so, petitioner believes that the jury likely would have disregarded her testimony. Petitioner, however, recognizes that "counsel did a commendable job cross-examining Davis on the accuracy of her opinions, and of the general validity of hair and fiber analysis." Appellant's Opening Br. at 88. The federal district court found that counsel's cross-examination of Davis satisfied *Strickland*. Reviewing de novo, we agree. Contrary to petitioner's argument, the record shows that counsel did cross-examine Davis about her background and training. During his first stage closing argument, defense counsel questioned Davis' credentials and reminded the jury of how little education and training she had in hair and fiber comparison. Even if counsel had

-54-

not challenged Davis' credentials, we have concluded that Davis was qualified to serve as an expert. Petitioner has not suggested how further cross-examination would have shown that she lacked expertise to testify as an expert. Thus, we conclude counsel's cross-examination was not deficient and petitioner cannot show prejudice.

Petitioner next argues that counsel failed to conduct sufficient pre-trial investigation concerning Paulo Gomes' identification of petitioner in a photographic line-up. If counsel had interviewed Gomes before trial, petitioner believes that counsel would have learned that Gomes had selected another person before selecting petitioner and that the magistrate judge who issued the search warrants was not informed of that fact. According to petitioner, this evidence would have created doubt as to his guilt and would have bolstered the suppression motion filed prior to trial.

On direct criminal appeal, the Oklahoma Court of Criminal Appeals, citing *Strickland*, determined petitioner failed to meet his burden of proving deficient performance or resulting prejudice with respect to his argument that counsel failed to conduct a proper investigation. *See Moore*, 788 P.2d at 401. Likewise, on post-conviction review, that court again cited *Strickland* and determined that "counsel ably brought out Gomes's inconsistencies and weak identification at trial. [Petitioner] cannot show that counsel's failure to contact Gomes pretrial

-55-

constituted a deficient performance which prejudiced his client." *Moore*, 889 P.2d at 1257 n.14.

Although counsel did not interview Gomes before trial, counsel established through cross-examination and later reminded the jury during first stage closing argument that Gomes had picked out someone else from the photo line-up. Counsel's performance was not deficient. Even assuming deficient performance, petitioner has failed to show that if defense counsel had interviewed Gomes before trial his cross-examination would have yielded any more and the result of the trial would have been different. Considering the evidence in total, we conclude there is no reasonable probability the jury would have reached a different result. The Oklahoma Court of Criminal Appeals' decision was not an unreasonable application of *Strickland*. *See* 28 U.S.C. § 2254(d)(1).

Third, petitioner argues that counsel should have objected to admission of the evidence found in the sack on top of the grocery store because many of the items in the sack were never conclusively linked to petitioner. Petitioner, however, has failed to even attempt to show that absent the evidence in the sack the result of the trial would have been different. Thus, petitioner has failed to prove prejudice.

Petitioner's final ineffective trial assistance argument is that counsel did not act as his advocate during second stage closing arguments. During argument,

counsel conceded 1) the State had proved all three aggravating circumstances beyond a reasonable doubt; 2) petitioner would be a threat if he is not incarcerated for life; 3) petitioner should be killed if he always acted as he did at the time of the murder; 4) the Oklahoma Department of Corrections realizes petitioner is dangerous; and 5) if petitioner is a threat to other prisoners, he should be executed. Without elaboration, petitioner maintains, contrary to the federal district court's determination, that confessing the heinous, atrocious or cruel aggravating circumstance and suggesting execution if a danger to other prisoners cannot be considered strategy.

We disagree. De novo review reveals that it was counsel's strategy to ask that petitioner's life be spared because he would not be a threat to society if imprisoned and he might contribute to society. In light of the strong evidence supporting the aggravating factors, and the psychological evidence indicating petitioner would not be a threat if he remained incarcerated for the remainder of his life, and the deferential scrutiny given counsel's performance, *see Strickland*, 466 U.S. at 689, counsel's strategy was not deficient performance. Petitioner has failed to overcome the presumption that under the circumstances trial counsel's argument was sound trial strategy. *See id.*

B. Ineffective Assistance of Appellate Counsel

A claim of ineffective assistance of appellate counsel presents a mixed question of law and fact. *See Newsted*, 158 F.3d at 1090. When claiming ineffective assistance of appellate counsel, a petitioner must show both constitutionally deficient performance and prejudice as required by *Strickland*. *See Newsted*, 158 F.3d at 1090. This court's review of counsel's decision to omit an issue on appeal is highly deferential. *See United States v. Cook*, 45 F.3d 388, 394 (10th Cir. 1995). An appellate counsel's performance may be deficient and may prejudice the defendant only if counsel fails to argue a "dead-bang winner." Id. at 395 (defining "dead-bang winner" as "an issue which was obvious from the trial record, . . . *and* one which would have resulted in reversal on appeal").

Petitioner argues that appellate counsel should have attacked the continuing threat aggravating circumstance on direct criminal appeal and should not have first raised the issue on rehearing. [17] The federal district court found no merit because petitioner conceded he had raised an issue of sufficiency of the evidence to support the aggravator on rehearing. We agree the claim has no merit, but for another reason. Because, as discussed above, there is no merit to

---

[17] Petitioner suggests without further argument or support that appellate counsel should have attacked each of the other aggravators. We do not consider unsupported and undeveloped issues. *See United States v. Kunzman*, 54 F.3d 1522, 1534 (10th Cir. 1995).

an attack on the continuing threat aggravator, this argument is not a "dead-bang" winner, and appellate counsel was not ineffective.

Petitioner argues that if any claims of ineffective assistance of trial counsel should have been raised on direct appeal, appellate counsel was ineffective for failing to raise them. The federal district court determined it had considered petitioner's claims of ineffective assistance of trial counsel and had found them to be without merit. Accordingly, the federal district court determined this claim of ineffective assistance of appellate counsel was without merit. Because we too reject petitioner's claims on their merits, we conclude appellate counsel was not ineffective for failing to raise the claims on direct appeal.

C. Cumulative Ineffective Assistance of Counsel

Petitioner believes that the district court should have considered the entire scope of counsel's representation, rather than looking at each item in isolation. Petitioner, however, failed to make this assertion in the district court. Thus, the district court's failure to consider the entire scope of counsel's representation was not error. We decline to address this argument raised for the first time on appeal. *See Oyler v. Allenbrand*, 23 F.3d 292, 299 n.8 (10th Cir. 1994).

X. CUMULATIVE ERROR

If this court fails to grant relief on any one issue, petitioner argues that this court should consider the cumulative effect of two or more seemingly harmless errors. Considering all of petitioner's claims, except his *Brady* claim for which we are remanding, we conclude petitioner has not met his burden of demonstrating that either his conviction or death sentence is constitutionally infirm.

XI.    CONCLUSION

In conclusion, we agree with respondent's position argued in his cross appeal and, therefore, we review petitioner's habeas claims under AEDPA. We REVERSE the district court's denial of habeas relief on petitioner's claim that police officers planted evidence against him, and REMAND that claim to the district court to permit discovery and, if necessary, an evidentiary hearing. In all other respects, we AFFIRM the district court's denial of habeas relief.

**Nos. 98-6004, 98-6010 – Moore v. Ward**

BRORBY, Circuit Judge, dissenting.

I respectfully dissent from that portion of the majority opinion that holds the Oklahoma Court of Criminal Appeals' "materiality determination" concerning allegations of planted evidence represents an unreasonable application of clearly established Supreme Court precedent. My difference of opinion is twofold. First, I believe the majority fails to honor the deferential standard of review mandated under the AEDPA. Second, even if we venture beyond the AEDPA standard and substitute our best guess as to the probable impact of the undisclosed evidence on the outcome of Petitioner's trial, Mr. Hawkins' statements concerning multiple hair sample collections, and his recollection of a deceased co-workers' comments concerning the detectives' unusual entry into the Petitioner's home following those collections, in no way undermine my confidence in the jury's verdict. Accordingly, I am unable to conclude the Oklahoma Court of Criminal Appeals was unreasonable in reaching the same conclusion.

I have no quarrel with the substantive law underlying Petitioner's *Brady* claim or the standard of review we apply to that claim. It is well settled (1) "the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment"; (2) "evidence is

material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"; and (3) "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Pennsylvania v. Ritchie*, 480 U.S. 39, 1001 (1987) (quotation marks and citations omitted). Because the Oklahoma Court of Criminal Appeals considered Petitioner's evidence in support of his planted evidence claim, and rejected that claim on the merits, it is further settled under the AEDPA that we may disturb the Oklahoma court's ruling only if it is "contrary to," or involves "an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As the majority acknowledges, the AEDPA mandates that we increase the degree of deference afforded state court adjudications. *See Boyd v. Ward*, 179 F.3d 904, 912 (10th Cir. 1999). My quarrel lies with what I deem to be the majority's misapplication of the AEDPA standard.

The majority recites the appropriate standard, but then concludes, without further reference to or analysis of the Oklahoma Court of Criminal Appeals' ruling, that because the "State's case against petitioner was entirely circumstantial," and the "existence and cross-transference of the fiber and hair evidence was crucial to the State's case," the Petitioner's *allegations* that police

-2-

officers planted hair and fiber evidence, *if proved*, "would be material," thus creating a reasonable probability that the result of Petitioner's trial would have been different.[1] As I understand our role under the federal habeas statutes, this court is not to reevaluate the evidence or second-guess the Oklahoma court's conclusion, but rather, must simply determine whether the Oklahoma court reasonably applied the appropriate federal constitutional standard to the facts or evidence presented.

It is clear the Oklahoma Court of Criminal Appeals applied precisely the same legal standard to evaluate the materiality of the Petitioner's proffered evidence of planted hair and fiber samples as that applied by the United States Supreme Court. After considering Mr. Hawkins' affidavits, the Oklahoma Court of Criminal Appeals concluded that, when "evaluated in the context of the entire record," Mr. Hawkins' statements were "not material," and did not "create a

---

[1] In my experience, most habeas petitioners make allegations which, if proved, would change the outcome of their conviction and sentence, and thus could be considered "material." Few, however, present the quality and/or quantity of evidence sufficient to warrant habeas relief. It is for this reason a federal habeas petitioner is entitled to discovery only "if, and to the extent that, the [district court] judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." Rule 6(a), Rules Governing Section 2254 Cases; *see also LaFevers v. Gibson*, 182 F.3d 705, 722 (10th Cir. 1999).

reasonable probability that the trial's outcome would be changed." *Moore v. State*, 889 P.2d 1253, 1258 (Okla. Crim. App.), *cert. denied*, 516 U.S. 881 (1995). Although we might have benefited from a more extensive discussion of the relative weight of that evidence compared to the rest of the evidence, in my view, the Oklahoma Court of Criminal Appeals unquestionably applied the correct rule of law and did not unquestionably err in its characterization of Mr. Hawkins' statements or its ultimate disposition of this fact-dependent issue. To delve beyond this analysis is to substitute this court's speculation as to the outcome of Petitioner's trial for the considered opinion of the Oklahoma Court of Criminal Appeals. I do not believe the AEDPA sanctions such interference. *See* 28 U.S.C. § 2254(d)(1); *see also Kyles v. Whitley*, 514 U.S. 419, 456-58 (1995) (Scalia, J. dissenting) (recognition, even prior to AEDPA-mandated deference, "that responsibility for factual accuracy, in capital cases as in other cases, rests elsewhere – with trial judges and juries, state appellate courts, and the lower federal courts").

Notwithstanding my hesitation to delve further, I simply do not believe there exists a reasonable probability the disclosure of Mr. Hawkins' statements to the defense would have changed the outcome of Petitioner's trial. The materiality of undisclosed favorable evidence "must be evaluated in the context of the entire

record." *United States v. Agurs*, 427 U.S. 97, 112 (1979). "It is simply not enough to show that the undisclosed evidence would have allowed the defense to weaken, or even to destroy the particular prosecution witnesses or items of prosecution evidence to which the undisclosed evidence relates." *Kyles*, 514 U.S. at 460 (Scalia, J. dissenting). The Petitioner must demonstrate that "in light of all the evidence, including that untainted by the Brady violation, it is reasonably probable that a jury would have entertained a reasonable doubt regarding petitioner's guilt." *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Agurs*, 427 U.S. at 112-13).

To the extent Mr. Hawkins' statements reflect his personal knowledge of the integrity of the detectives' investigation of Ms. Gilbert's death, he states only that the detectives returned to the funeral home on three separate occasions to obtain samples of the victim's pubic, scalp and limb hairs, that they should have plucked instead of cut the hairs the first time, and that they took up to two and one-half hours to obtain additional evidence on the third visit. He further claims the hair samples were undoubtedly affected by the embalming process, and he witnessed an open window at the Petitioner's home on two occasions after the detectives' second and third visits to the funeral home. These facts, even accepted as true, simply do not constitute material evidence to support

-5-

Petitioner's claim the police planted evidence. As the majority points out, the remainder of Mr. Hawkins' statements reflect his recollection of a now deceased co-worker's comments concerning the co-worker's alleged surveillance of the detectives' activity following their second visit to the funeral home. Here again, even accepting this obvious hearsay evidence as true, it simply does not undermine my confidence in the outcome of Petitioner's trial.

For all these reasons, I would affirm the district court's denial of habeas relief on Petitioner's *Brady* claim.